COMMONWEALTH *vs.* SEAN MYER.[1]

No. 94-P-140.

Essex. November 10, 1994. - February 15, 1995.

Present: SMITH, KAPLAN, & GILLERMAN. JJ.

*Evidence*, State of mind, Relevancy and materiality, Cross-examination. *Practice, Criminal*, Argument by prosecutor.

At the trial of a complaint in two counts, alleging assault and battery and being a disorderly person, evidence that the defendant had struck and injured the complainant seven months after the incident for which he was being tried was properly admissible to show the defendant's state of mind and, in any event, was properly introduced on redirect examination of the complainant to rehabilitate her testimony; its probative value outweighed any prejudice to the defendant. [143-145]

At a criminal trial the prosecutor's closing argument, which was properly confined to the evidence and the fair inferences therefrom, did not create a substantial risk of a miscarriage of justice. [145-146]

COMPLAINT received and sworn to in the Peabody Division of the District Court Department on July 22, 1991.

On transfer to the jury session of that division, the case was tried before *Robert E. Hayes*, J.

*Michele R. Moretti* for the defendant.

*Robert J. Bender*, Assistant District Attorney, for the Commonwealth.

GILLERMAN, J. In September, 1992, the defendant was convicted by a jury of one count of assault and battery, G. L. c. 265, § 13A, and one count of being a disorderly person, G. L. c. 272, § 53. The defendant appeals, claiming errors in the admission of certain testimony by the complainant, with whom the defendant was living, and in the closing argument of the prosecutor. We affirm.

---

[1]The caption reflects the defendant's name as it appears on the complaint; at trial, he testified that his name was Sean E. Myers.

During the evening of July 20, 1991, and until the morning of the next day, the defendant consumed a substantial amount of alcoholic beverages, became drunk and violent, and then insisted on having sex with the complainant. She refused, but the demands continued, and she was unable to sleep. At about 6:00 A.M. the defendant threatened to jump out of the fifth-floor window of the apartment they shared because the complainant did not love him. The complainant told him to "go ahead if he wanted to." She then scooped up her baby (to whom the defendant was not related) and walked outside the apartment to the common hallway to call her mother for help.

The defendant followed her into the hallway, grabbed the child and returned to the apartment. The complainant followed, screaming for her child. The defendant grabbed the complainant by the throat and pushed her down on the floor. She could not breathe, and felt dizzy. Suddenly the assault stopped; the police were knocking on the door. Two officers entered the apartment over the defendant's protests and his abusive language. After seeing the complainant's distraught condition, listening to her charges that the defendant had tried to strangle her, and seeing red marks on her neck, the officers tried unsuccessfully to persuade the defendant to gather some clothes and leave. The defendant was in no mood to make peace, and when he reached into the kitchen drawer containing knives, one of the officers slammed the drawer shut, and both officers seized the struggling defendant, handcuffed him, and took him away in their cruiser. These, in brief, were the facts that the jury could have found, and they evidently disbelieved the defendant's testimony that none of the events described by the complainant had in fact occurred.

1. *The examination of the complainant.* A reasonable juror could have concluded that the cross-examination of the complainant was effective. She testified that there had been prior incidents involving the defendant. She had applied for a restraining order against the defendant but admitted that she subsequently withdrew it. She also admitted that on August

14, 1991, when she was "back with Mr. Myers," she met defendant's counsel at a court hearing on this case and told him that she was going to the district attorney's office to "drop the charges." She also admitted that she did indeed go to the district attorney's office, but they refused to "take her statement."

Two months later, the complainant acknowledged, she "split up" with the defendant (the defendant was seeing someone else), and charges were brought against the complainant for harassing telephone calls. Following those events, the complainant returned to the office of the district attorney; this time she said she wanted to go forward with the case. She gave them a written statement.

The complainant completed her testimony under cross-examination without explaining why she had withdrawn her application for a restraining order, or why she had attempted to withdraw her charges in this case and then changed her mind. The defendant challenged the credibility of the complainant by making it appear either that her decisions to bring or drop charges against the defendant were whimsical or that she pressed the charges in this case because her relationship with the defendant had ended, and not because she wanted to reveal the truth of the matter.

On redirect examination, the prosecutor sought to rehabilitate the complainant. She testified that she wanted to drop the charges against the defendant in August, 1991, because the defendant told her he didn't want to go to jail, and he asked her to drop the charges. The prosecutor pressed on; he inquired about an event following the July, 1991, episode with which the defendant was charged in this case. He asked whether, during this subsequent event, the defendant struck her and injured her. The defendant did not object to the question; nor did he request a limiting instruction. The complainant replied that there was such an episode, and that in consequence of it she had suffered a broken nose and a hole in her eardrum. After this answer, the defendant did object; but the judge overruled the objection because the answer was "already in. It should have been objected to earlier." Follow-

ing that ruling, the complainant testified that this previously unmentioned episode of violence had occurred in February, 1992, approximately seven months after the events involved in this case, and that she had not dropped the charges she had made in connection with that incident. (The circumstances of the February, 1992, episode were not further described.)

The defendant argues that the complainant's testimony of an unrelated bad act seven months after the offense charged[2] had no probative value and therefore was inadmissible. This argument is made on the basis of the claim that the defendant's objection was timely. It was not timely; the judge said so, and the transcript confirms the judge's ruling. Our review, therefore, is limited to determining whether, had the objection been timely, the evidence should have been excluded and, if so, whether the wrongly admitted evidence created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967). Compare *Commonwealth* v. *Beattie*, 409 Mass. 458, 459-460 (1991).

We conclude that the objection, had it been made, would properly have been overruled. The difficulty with the defendant's argument is that the February, 1992, incident, which left the complainant with serious injuries, *was* related to the charges in this case. It did not tend merely to show, impermissibly, the defendant's bad character or his propensity to commit the crime charged. See, e.g., *Commonwealth* v. *Triplett*, 398 Mass. 561, 562-563 (1986) (evidence that the defendant lost his job because of a bad temper, and that the defendant received a less than honorable discharge from the army held not admissible). Rather, the February, 1992, episode would tend to prove that assaulting the complainant was

---

[2]Whether the alleged "bad act" occurred before or after the event that is the subject of the pending charges is not of itself a bar to admission. See *Commonwealth* v. *Odell*, 34 Mass. App. Ct. 100, 103 (1993). In any event, the defendant does not argue the point, and we need not discuss it further. The defendant also does not argue any possible remoteness of the subsequent bad act, and we do not regard the seven-month interval as too remote. Again, see *ibid.* (three months not too remote).

a critical element of the defendant's hostile relationship with her, see *Commonwealth* v. *Nardone*, 406 Mass. 123, 128 (1989), and that his hostility toward the complainant, although he lived with her, was a vital aspect of his "state of mind." *Commonwealth* v. *Robertson*, 408 Mass. 747, 751 (1990). See also Liacos, Massachusetts Evidence § 4.4.7, at 158-160 (6th ed. 1994) (collecting "state of mind" cases).

We also conclude that the judge would properly have concluded that the probative value of the subsequent episode outweighed the danger of prejudice to the defendant. See *Commonwealth v. Chalifoux*, 362 Mass. 811, 816 (1973). Here, as in *Commonwealth* v. *Errington*, 390 Mass. 875, 879-880 (1984), the credibility of the complainant was critical to the Commonwealth's case. Earlier in this opinion, we observed that it might have appeared that the complainant's value as a witness had been seriously challenged by what seemed to be her whimsical conduct, leaving the truth of her charges against the defendant uncertain. "[T]he Commonwealth's need to rehabilitate the witness was clear." *Id.* at 880. Thus, the Commonwealth had a substantial and legitimate interest in rehabilitating the complainant by showing that the defendant's conduct as charged in this case was part of a pattern and not an isolated event. That, in turn, could assist the jury in understanding the complainant's relationship to the defendant, and her apparent vacillation on cross-examination.

Without doubt, the evidence of the subsequent bad acts had a prejudicial effect, but the Commonwealth's serious need to rehabilitate a critical witness, the fact that the need for the testimony was created by defense counsel's cross-examination, and the plausibility of the evidence offered by way of rehabilitation make it appear that the judge would likely have concluded, as do we, that the probative value of the evidence to the Commonwealth outweighed its possible prejudicial effect upon the defendant. See *Commonwealth* v.

*Montanino*, 409 Mass. 500, 506 (1991), discussing *Commonwealth* v. *Errington*, *supra*.[3]

2. *The prosecutor's closing argument.* The defendant argues that portions of the prosecutor's closing argument, which we set out in the margin,[4] were "rife with error," although at trial the defendant failed entirely to object to the prosecutor's remarks. "Although not dispositive of the issue, the absence of any such request from experienced counsel is some indication that the tone, manner, and substance of the now challenged aspects of the prosecutor's argument were

---

[3]The defendant also argues, for the first time on appeal, that the judge failed to give a limiting instruction — that the subsequent bad act was not admitted as tending to prove the commission of the crime charged, but only as evidence of the defendant's state of mind. There was no request for such an instruction, however, and the judge's failure to give the instruction was not error. *Commonwealth* v. *Errington*, 390 Mass. at 882. Thus the bad acts evidence was competent for all purposes. See *Commonwealth* v. *Baker*, 20 Mass. App. Ct. 926, 927 (1985).

[4]"[Defense counsel] said that whenever things would go bad she'd make something up and accuse him of something. Well, maybe that's the reason they would break up and then get back together again, maybe there's strong ties there. She had a child, they'd been together, they break up, they reconcile, they get back together. Maybe the reason isn't that they have trouble and she makes something up to get him back. Maybe the reason is that they're together, *and she believes in him, and she believes that he's not going to hit her, and he's a sweet talker, the man who cried alligator tears here on the stand,* maybe this sweet talker whose look comes across so nice and sweet, and I just wanted to talk to her that morning after I'd been drinking for ten, twelve hours. *Maybe the reason they break up is because he hits her.*

"The woman told you. [Defense counsel] asks what happened after the breakup, what happened after this incident? What happened? Didn't you come in, didn't you drop a case? Any reasons why, *she said well, we're back together and he's saying all the time, drop the case, drop the case. I'll be good, I won't do this again. There's another case she didn't drop. She had her nose broken and her eardrum punctured. She told you that on the stand. She said that's still going on. And this is still going on and this is what you're concerned about. This particular incident.*" (Emphasis in defendant's brief.)

The defendant also complains of a later portion of the closing, which follows:

"What I'm submitting to you makes him guilty is when the woman comes in and tells you what happened, how believable she was."

not unfairly prejudicial." *Commonwealth* v. *Toro*, 395 Mass. 354, 360 (1985).

We consider the contested remarks "in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial." *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. 224, 231 (1992). And, as the defendant concedes, we conduct this review only to assure there is not a risk of a substantial miscarriage of justice. *Commonwealth* v. *Cobb*, 26 Mass. App. Ct. 283, 288 (1988).

The prosecutor did not "blatantly misstate[] the evidence," as the defendant claims. "A prosecutor is entitled to argue the evidence and fair inferences to be drawn therefrom." *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. at 231. The inferences need only be reasonable and possible; they need not be necessary or inescapable. *Commonwealth* v. *Dinkins*, 415 Mass. 715, 725 (1993). In attributing certain motivation, or a state of mind, to the complainant and to the defendant, the prosecutor confined his remarks to the evidence and to the fair inferences therefrom. There was no wrongful appeal to jury sympathy by calling upon the jurors to place themselves in the victim's position. Contrast *Commonwealth* v. *Sevieri*, 21 Mass. App. Ct. 745, 753-754 (1986). Nor did the prosecutor vouch for the credibility of a witness or disparage the character of the defendant impermissibly. Nowhere do we find that level of prejudice that exists when the prosecutor, for example, refers to the defendant's failure to testify, or where the prosecutor expresses a personal belief in the defendant's guilt, or where the prosecutor appeals to ethnic prejudice in an effort to sway the jury. See *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. at 232. "On the entire record, it cannot be said that the argument, to the extent that it went unmitigated by the judge's closing charge, produced a substantial risk of a miscarriage of justice." *Commonwealth* v. *Cobb*, 26 Mass. App. Ct. at 288, quoting from *Commonwealth* v. *Harris*, 11 Mass. App. Ct. 165, 176-177 (1981).

*Judgments affirmed.*