## COMMONWEALTH vs. ROLAND WALKER

Norfolk. May 3, 2004. - July 23, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Homicide. Wanton or Reckless Conduct. Evidence,* Reputation, Pattern of conduct, Prior misconduct. *Practice, Criminal,* Trial of indictments together, Verdict. *Words,* "Poison."

Evidence at the trial of an indictment charging manslaughter established that the defendant, by surreptitiously mixing multiple doses of his prescription sleeping medication with alcohol and serving it to another, demonstrated an indifference to, and disregard of, the high degree of likelihood that substantial harm would result to another. [191-193]

Evidence at the trial of indictments alleging that the defendant mingled poison with food, drink, or medicine, in violation of G. L. c. 265, § 28, provided a sufficient basis for the jury to conclude that temazepam, an active ingredient in the defendant's prescription sleeping medication, constituted a "poison" within the meaning of the statute when mixed with a drink and served to another, and that the defendant intended to injure the victims when he mixed the temazepam in the victims' drinks. [193-197]

This court declined to alter the settled law concerning the admission of character evidence by adopting Proposed Mass. R. Evid. 405 (a), which would permit character witnesses to testify not only about a person's reputation in the community, but also about their own opinion of the person's character. [197-199]

A criminal defendant charged in multiple indictments failed to demonstrate that the trial judge abused his discretion in determining that the crimes were sufficiently related to be tried together, or that he was unfairly prejudiced by their joinder. [199-201]

At a criminal trial, evidence of the defendant's prior bad acts properly was admitted to show a common scheme or pattern of conduct, and was sufficiently related in time, place, and form to the charges being tried; further, any prejudice arising from the admission of such evidence was ameliorated by the judge's limiting instructions. [201-203]

A criminal defendant failed to demonstrate that his conviction of manslaughter was legally inconsistent with his conviction for mingling poison with food or drink with the intent to injure or kill, in violation of G. L. c. 265, § 28. [203-204]

INDICTMENTS found and returned in the Superior Court Department on April 16, 1997; February 25, 1998; and July 25, 1998.

A motion for joinder of indictments was heard by *Herman J. Smith, Jr.*, J., and the cases were tried before *Julian T. Houston*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Varsha Kukafka*, Assistant District Attorney, for the Commonwealth.

*Charles W. Rankin* for the defendant.

IRELAND, J. A jury in the Superior Court convicted the defendant of involuntary manslaughter, assault with intent to rape, drugging for purposes of sexual intercourse, assault and battery by means of a dangerous weapon (four indictments), and mingling poison with drink with intent to kill or injure (four indictments).[1] The indictments were based on three incidents involving four women in which the defendant invited the women to his apartment and served them drinks mixed with his prescription sleeping medication, temazepam. The drinks rendered all four women unconscious. At least one of the women was sexually assaulted while unconscious, and another died as a result of the combination of the drug and alcohol.

On appeal, the defendant claimed that (1) the manslaughter conviction must be reversed because there was insufficient evidence to establish that his conduct posed a high degree of likelihood that substantial harm would result to another person; (2) the convictions of mingling poison with drink must be reversed because there was no proof that the sleeping medication constitutes a poison under the statute; (3) he should have been permitted to introduce character evidence through three witnesses; (4) the indictments were improperly joined; (5) the judge erred in admitting evidence of prior bad conduct; and (6) the manslaughter conviction is inconsistent with the conviction of mingling poison with drink. The Appeals Court affirmed eight of the convictions and reversed the convictions of three of the four poisoning indictments. See *Commonwealth* v. *Walker*, 60 Mass. App. Ct. 255, 270 (2004). We granted the Commonwealth's application for further appellate review. We conclude that there was sufficient evidence for a rational jury to

---

[1]The jury acquitted the defendant of a charge of rape.

find the defendant guilty of involuntary manslaughter, and that the definition of "poison" as used in G. L. c. 265, § 28, encompasses temazepam (the active ingredient in the defendant's sleeping medication). Furthermore, the judge properly allowed the Commonwealth's motion for joinder of the indictments and did not err in excluding the proffered testimony of the defendant's good character. Finally, we conclude that the evidence of the defendant's prior bad acts properly was admitted, and the guilty verdicts of poisoning and involuntary manslaughter are not legally inconsistent. For these reasons, we affirm the convictions.

*Background.*

1. *The Commonwealth's case.* We summarize the facts the jury could have found, reserving certain details for discussion in connection with the specific issues raised. The defendant[2] was prescribed Restoril, a sleeping medication containing the drug temazepam.[3] The defendant had prescriptions for Restoril filled through 1995 and 1996. He stored thirty milligram capsules of Restoril in his kitchen. The defendant's bottle of Restoril carried labels reading: (1) "May cause drowsiness. Alcohol may intensify this effect. Use care when operating a car or dangerous machinery"; and (2) "Caution: Federal law prohibits the transfer of this drug to any person other than the patient for whom it was prescribed." The defendant knew that mixing Restoril with alcohol intensified the effects of both.

a. *Incidents giving rise to charges against the defendant.* D.K. and E.R. were friends and neighbors. On the evening of June 7, 1995, they went to the defendant's apartment to socialize. The defendant prepared alcoholic drinks for the women. At the defendant's suggestion, D.K. put on a minidress. E.R. changed into a negligee. Before either woman had finished a second drink, they both became tired and groggy. D.K. was experiencing a sense of paralysis; she "knew [that] something was wrong" but was unable to "do anything about it." Shortly thereafter, both women lost consciousness.

---

[2]In 1998, at the time of trial, the defendant was seventy-one years old.

[3]Temazepam is a class C controlled substance. See G. L. c. 94C, § 31. Along with Valium and Xanax, temazepam is part of the benzodiazepine family of drugs. In addition to being used as a sleeping medication, temazepam is used to treat severe anxiety and panic attacks.

When D.K. and E.R. awoke nine hours later in the defendant's bedroom, D.K. still had on the minidress, but her underpants were on the floor. The women felt sick and had trouble walking. The defendant drove them to D.K.'s apartment. Once home, D.K. telephoned the police and was told to go to a hospital. A blood screen was done at the hospital and tests revealed the presence of benzodiazepine in blood samples from both women.[4] A sexual assault (or rape kit) examination of D.K. showed blood and a sperm stain on her underpants.[5] Deoxyribonucleic acid (DNA) analysis revealed that approximately twelve per cent of African Americans, including the defendant, could have contributed to the stain.

The second incident occurred on June 14, 1996, when M.N., then thirty years old, visited the defendant at his apartment. During the visit, M.N. consumed clam chowder and what the defendant told her was fruit punch.[6,7] M.N. then lost consciousness, but was aware of the sensation of someone touching and pounding at her rectal area.[8]

She woke up at her home the next morning without her bra and wearing a different dress; her rectal area felt painful and "dirty." M.N. telephoned the defendant and accused him of raping her, to which he responded that he "tried," but did not "discharge" inside her. He told her not to go to a hospital and offered her $100, which she refused. M.N. went to a hospital that evening, where testing of her blood, while initially negative

---

[4]Neither D.K., who was prescribed Mellaril and Prozac, nor E.R., who was prescribed Lithium, took any medicine classified as a benzodiazepine. The medications they took had no effect on memory, even when combined with alcohol.

[5]A sexual assault examination of E.R. found nothing of evidentiary significance.

[6]At trial, the defendant admitted that he served M.N. a "drink." Detective Sergeant John Courtney of the Randolph police department testified that during the investigation of the M.N. incident, the defendant told him that he mixed fruit punch, grapefruit, and vodka in M.N.'s drink.

[7]According to M.N., on a prior visit to the defendant's apartment, although she advised him that she did not drink alcohol, he prepared a beverage for her containing Kahlua and milk. She testified that she became unconscious after consuming the drink, but could feel the defendant kissing her cheeks. No indictment was brought with respect to that incident.

[8]M.N. remembered the defendant's helping her down the stairs and taking her to her apartment. She felt drowsy and did not speak to the defendant.

for benzodiazepine, later showed the presence of temazepam.[9] A sexual assault examination revealed an abrasion on her external genitalia.

The final incident occurred on December 26, 1996. That evening, M.P., then fifty-eight years old, packed an overnight bag and left with the defendant. According to M.P.'s daughter, M.P. had some alcohol to drink before the defendant arrived. The following morning, in response to the defendant's 911 call, emergency personnel arrived at the defendant's apartment; M.P. was pronounced dead at the scene. The medical examiner testified that M.P. had died from a combination of temazepam and alcohol.[10] Results of the DNA analysis on a rectal swab taken from M.P.'s body disclosed the presence of sperm cells and genetic material which was consistent with "the sum of DNA" from M.P. and the defendant.

b. *Expert testimony regarding temazepam.* Dr. David Robert Gastfriend, a psychiatrist and chief of addictive services at Massachusetts General Hospital, testified that thirty milligrams comprises a "full adult dose" of temazepam, but that, starting at age fifty years, a therapeutic dose for treating insomnia would be one-half that dose, or fifteen milligrams. He explained that, in persons aged fifty years or older, temazepam "can tranquilize the brain's sensor for smothering . . . depress the brain's drive to continue breathing," and thus, in such older persons, "there is a risk of essentially stopping breathing . . . with excessive dose."[11] Dr. Gastfriend also testified that alcohol taken in conjunction with temazepam does not simply add to the effect of the drug, but multiplies its impact. As a result, patients who are prescribed temazepam are given strong warnings not to take it with alcohol. He opined that, based on the level of temazepam in M.P.'s blood (drawn approximately eight hours after she ingested temazepam), she likely had ingested two or more thirty milligram temazepam pills the night before.

Dr. Alan David Woolf of Children's Hospital in Boston, the

[9]M.N. did not take any medications that would have tested positive for this drug.

[10]M.P. was prescribed Procardia and Pravachol; neither is a benzodiazepine.

[11]Dr. Gastfriend further stated that temazepam causes amnesia, makes a person who is not used to it dizzy, tired, groggy, and unable to walk a straight line without staggering.

Massachusetts poison control system, and Harvard Medical School also testified. He said that the poison control system defines poison or poisoning as "an exposure to a drug or a chemical or a biological compound that injures a human."[12] Dr. Woolf explained that, while benzodiazepines are among the regulated drugs that are "fairly safe," they are nevertheless categorized as "Class 4" substances, which means that benzodiazepines, or their compounds, can only be dispensed with a prescription from a properly licensed physician. Dr. Woolf said that benzodiazepines generate the third highest number of calls to the poison control center for poisoning by pharmaceuticals. He described their side effects as including loss of memory or impaired memory, impaired motor control, drowsiness, and impaired consciousness. He also stated that there is a "synergistic" effect when alcohol and temazepam are mixed together, meaning that each enhances the other's effects on the body. Moreover, Dr. Woolf opined that benzodiazepines are "never safe" when they are combined with alcohol because they may cause a "respiratory depression" or a "respiratory arrest," by making a person "forget" to breathe.

2. *The defendant's case.* The defendant testified at trial and denied any sexual contact with D.K., E.R., or M.N. He acknowledged that he made drinks for D.K., E.R., M.N., and M.P., but denied that he added any drug to what he served them. The defendant testified that he and M.P. had consensual intercourse, that he mixed a couple of drinks for her,[13] and that she fell asleep on his couch. The next morning, finding M.P. unresponsive, the defendant dialed 911. He denied having anal intercourse with M.P.[14] The defendant was convicted of manslaughter of M.P. on the theory of wanton and reckless

[12]Dr. Woolf added that "any either intentional or inadvertent exposure to any chemical [that] can result in injurious effects, or have the potential to induce injurious effects on the victim is considered a poison or poisoning."

[13]There was evidence that the defendant knew that M.P. had had alcohol that evening before he prepared the drinks for her.

[14]The defendant's DNA expert concluded that the defendant should have been excluded as a source of the genetic material found in D.K.'s underwear and as a source of the sperm fraction of the rectal swab taken from M.P.'s body. The defense toxicologist agreed that temazepam properly was detected in M.N.'s blood sample, but gave an opinion that the tests conducted on the blood samples of D.K., E.R., and M.P. were not conclusive and the positive

conduct; assault with intent to rape and drugging for sexual intercourse of M.N.; assault and battery by means of a dangerous weapon on all four victims; and mingling poison with drink with intent to kill or injure with respect to all four victims.

*Discussion.*

1. *Manslaughter.* On appeal, the defendant argues that the evidence was insufficient to find him guilty of the crime of involuntary manslaughter, because it did not establish that his conduct posed a high degree of likelihood that substantial harm would result to another. The defendant concedes that, viewing the evidence in the light most favorable to the Commonwealth, the jury could have found that the defendant mixed his prescription medication, Restoril, into an alcoholic drink, which he gave to M.P. She drank it and died shortly thereafter from the combined effect of alcohol and the drug temazepam contained in Restoril. The defendant acknowledges that he knew there were at least two labels on the bottle of medication, one warning him that it was a Federal offense to give the drug to anyone else, and a second instructing him not to drink any alcohol when taking the medication. The defendant also concedes that the jury could have found that, on two other occasions (first involving D.K. and E.R. and then M.N.), the women had fallen asleep when he gave them a "similar mixture."

Relying on these facts, the defendant argues, however, that involuntary manslaughter could not be proved because Restoril is a legally prescribed medication that has numerous legitimate and "fairly safe" uses. Moreover, he argues, there was no label warning him that his conduct created a high degree of likelihood that substantial harm would result to another. We disagree with the defendant's narrow interpretation of the relevant case law. Furthermore, we conclude that his contention concerns the weight and credibility of the evidence, "a matter wholly within the province of the jury." *Commonwealth* v. *Martino*, 412 Mass. 267, 272 (1992).

We have often stated that, "involuntary manslaughter includes an unlawful homicide unintentionally caused by wanton and reckless conduct." E.g., *Commonwealth* v. *Catalina*, 407 Mass.

findings of benzodiazepine in the samples from D.K. and E.R., and of temazepam in M.P.'s blood were not reliable.

779, 789 (1980), citing *Commonwealth* v. *Welansky*, 316 Mass. 383 (1944). "[W]anton or reckless conduct," in turn, "is intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another." *Commonwealth* v. *Welansky, supra* at 399. "[E]ven if a particular defendant is so stupid [or] so heedless . . . that in fact he did not realize the grave danger, he cannot escape the imputation of wanton or reckless conduct . . . if an ordinary normal [person] under the same circumstances would have realized the gravity of the danger." *Id.* at 398-399. See *Commonwealth* v. *Grey*, 399 Mass. 469, 472 n.4 (1987). Thus, under the *Welansky* theory, "[c]onduct which a reasonable person, in similar circumstances, would recognize as reckless will suffice . . . ." *Commonwealth* v. *Catalina, supra.*

Viewing the evidence and reasonable inferences from that evidence in the light most favorable to the Commonwealth, we conclude that the Commonwealth presented sufficient evidence for a rational jury to find the defendant guilty beyond a reasonable doubt of the involuntary manslaughter of M.P. *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). The Commonwealth's evidence demonstrated that the defendant mixed his prescription medication in M.P.'s drink in four to six times the recommended dosage for a person over fifty years of age. The clearly affixed warning on the pill bottle stated that the medication was not to be taken with alcohol. The "synergistic" effect of mixing alcohol and prescription sleeping medication was explained by two experts at trial.[15] Significantly, the defendant admitted at trial that he was aware of the warning label and that alcohol enhanced the effects of the medication. An ordinary person would have understood the admonition not

---

[15]Both the warning label and the expert testimony reflected the concern that is all too well known and too often demonstrated in our society, namely that the combination of sleeping pills and alcohol can be deadly. See, e.g., *Commonwealth* v. *Pettie*, 363 Mass. 836, 838 (1973) (defendant convicted of manslaughter where expert testified that combination of alcohol and sleeping pills would be expected to result in death); *Hickey* v. *Kendall*, 111 Md. App. 577, 607 (1996) ("it is a matter of common knowledge that certain drugs are contraindicated if a patient has recently used alcohol, because the consumption of alcohol is accompanied by well-known psychological and physical side effects").

to mix the sleeping pills with alcohol as a warning that the combination could be toxic, if not lethal, particularly in light of the fact that, on prior occasions, the defendant had administered temazepam in alcoholic beverages to women and watched its injurious effects take hold of them.[16] See *Commonwealth* v. *Catalina, supra* at 789 (evidence that defendant distributed heroin that led to victim's death sufficient to support manslaughter indictment); *Commonwealth* v. *Thompson*, 6 Mass. 134, 141 (1809) (had defendant previously administered same medicine and witnessed its injurious effects on other patients, jury could have found him guilty of manslaughter). In sum, the jury were entitled to conclude that the defendant's act in surreptitiously mixing multiple doses of his prescription sleeping medication with alcohol and serving the mixture to M.P. demonstrated an indifference to, and disregard of, the high degree of likelihood that substantial harm would result to her. See *Commonwealth* v. *Welansky, supra* at 397, 399, 401. See also *Commonwealth·* v. *Scofield*, 360 Pa. Super. 552, 559 (1987) (convictions of reckless endangerment and aggravated assault upheld; defendant driver's ingestion of prescription medication with alcohol was act of intentional recklessness, as "[i]t must be presumed that if [the defendant] was ingesting [the drug] pursuant to a doctor's prescription, he had been informed of the danger of driving with such drug[s] in his system or taking alcohol in combination with the drug[ ]").[17]

2. *Mingling poison with food or drink.* The defendant next

[16]It is of "no consequence that the defendant may have meant no harm to the victim." *Commonwealth* v. *Depradine*, 42 Mass. App. Ct. 401, 407 (1997), quoting *Commonwealth* v. *Twitchell*, 416 Mass. 114, 122 (1993).

[17]We reject as meritless the defendant's contention that, because he administered a prescribed medication to his victims, he cannot be considered aware of the risk involved, unlike, for example, the situation involving heroin, which has no currently accepted medical use and which has a high risk of death associated with its use. See *Commonwealth* v. *Catalina*, 407 Mass. 779, 790 (1990). A person of ordinary intelligence would be aware that there are varying risks associated with all prescription medications. It is a matter of both common knowledge and common sense that a prescription is required to obtain certain medications precisely because they contain drugs that are not safe except when administered and supervised by a physician or other properly licensed practitioner. See 21 U.S.C. § 353 (b)(1)(A) (2000) (prescription required because drug is "not safe for use except under the supervision of a practitioner licensed by law to administer such drug"). Even if we were to as-

argues that the evidence was insufficient to establish that temazepam is a poison under G. L. c. 265, § 28. General Laws c. 265, § 28, provides, in relevant part: "Whoever mingles poison with food, drink or medicine with intent to kill or injure another person . . . shall be punished . . . ." Although the statute itself does not define the term "poison," and no prior Massachusetts decision has elucidated the term as it is used here, the judge gave an instruction that comported with the dictionary definition of poison. The judge instructed the jury that "[t]he word 'poison' means any substance introduced into the body by any means which by its chemical action is capable of causing injury or death." See Webster's Third New Int'l Dictionary 1751 (1993) ("a substance [as a drug] that in suit-able quantities has properties harmful or fatal to an organism when it is brought into contact with or absorbed by the organ-ism: a substance that through its chemical action [usually] kills, injures, or impairs an organism"). The judge also instructed the jury that they were to decide "whether temazepam or benzodi-azepines are poisons in this case."

On appeal, the defendant does not dispute that the judge gave a correct definition of poison, but argues that the term "poison" was not intended to include "a legitimate, beneficial prescrip-tion medication," even if that medication was used in a manner not contemplated by the drug's manufacturer. According to the defendant, the statute is unconstitutionally vague as applied to him because it did not give him fair notice that temazepam was susceptible of being classified as a poison.[18]

By using a generic word "poison," the Legislature left it to

_____

sume (which we do not) that an ordinary person was unaware of this fact, a label on the defendant's medication specifically conveyed the same point. The label informed the defendant not to give the drug to anyone else, a statement an ordinary person would have understood to mean that doing so may create a risk of harm.

[18]There is no merit in the defendant's claim that the statute is void for vagueness. A person of common intelligence would not have to guess at the meaning of the term "poison" or have difficulty imagining that the statute would prohibit mixing a prescription sedative into an alcoholic beverage and serving it to an unwitting victim. See *Commonwealth* v. *Twitchell, supra* at 123; *Commonwealth* v. *Oakes,* 407 Mass. 92, 95 (1990) (test for vagueness as applied to defendant's conduct requires examination of facts in light most favorable to Commonwealth). Every person of average intelligence knows that

the courts to clarify and expand the definition of that term from time to time. See *Commonwealth* v. *Twombly*, 435 Mass. 440, 443 (2001) (when statute does not define term, courts interpret term according to its ordinary and approved usage). Poison is a broad term that denotes a wide variety of substances. Most commonly viewed as poison are those substances that are so inherently dangerous that no reasonable person in normal circumstances would ingest them. For example, in two of the earliest cases to interpret G. L. c. 265, § 28, and its predecessors, the defendant in each instance used a commercial substance known as "[R]ough on [R]ats," an arsenic mixture considered to be a "deadly poison." See *Commonwealth* v. *Kennedy*, 170 Mass. 18, 20 (1897) (defendant attempted to combine "Rough on Rats" with victim's afternoon tea); *Commonwealth* v. *Hobbs*, 140 Mass. 443, 446 (1886) (defendant mixed "Rough on Rats" with meal used to bake his former landlady's bread).[19] In the present case, because of the wide range of appropriate uses for temazepam, it does not fall into the category of a "per se" poison, as does a substance like "Rough on Rats."

However, in addition to "per se" poisons, there are substances that have beneficial uses, but when used improperly, may have the capacity to act as a poison. *Commonwealth* v. *Bearse*, 108 Mass. 487, 487-488 (1871) (belladonna can constitute poison).[20] *Commonwealth* v. *Galavan*, 9 Allen 271, 272-273 (1864) (use

---

prescription medication can be harmful when used improperly, especially when mixed with alcohol.

There also is no merit in the defendant's argument (comprised of one sentence with no citations to supporting authority) that the presence of G. L. c. 272, § 3 (prohibiting drugging another person with the intent to overpower, thereby enabling one to have sexual intercourse with the victim), somehow prohibits his convictions under G. L. c. 265, § 28.

[19]In addition, certain other substances are viewed as poison. See, e.g., G. L. c. 94B, § 1 (requiring "highly toxic" hazardous substances to be labeled with the word "poison"); G. L. c. 132B, § 2 (certain pesticides must be labeled with the word "poison").

[20]See Webster's Third New Int'l Dictionary 200 (1993) (belladonna defined both as "a European poisonous plant" and as "a medicinal extract from the belladonna plant").

of cantharides as poison).[21] See *King* v. *Solomon*, 323 Mass. 326, 331 (1948) (medical malpractice case where "the harm resulted from [an injection of morphine] which in effect was a poison").[22] Courts in other jurisdictions support the position that a drug that is beneficial in some circumstances can be used as a poison. See, e.g., *United States* v. *Gilbert*, 120 F. Supp. 2d 147, 154 (D. Mass. 2000) (epinephrine); *United States* v. *Narciso*, 446 F. Supp. 303, 306 (E.D. Mich. 1977) (pavulon); *Tidd* v. *Skinner*, 225 N.Y. 422, 426 (1919) ("heroin, except as a medicine used in very small quantities and under the direction of a physician, is a poison dangerous to human life"). See also State vs. Boles, No. 98-BA-6 (Ohio Ct. App. Sept. 17, 2001) (convictions under poisoning statute affirmed where defendant secretly added over-the-counter medicine to police officers' food).

There is no doubt that temazepam, administered improperly, is capable of causing injury, thus acting as a poison. While temazepam can be safely administered in limited circumstances, there are also dangers associated with its use — thus the requirement that it be used only by prescription under the supervision of a doctor or other duly licensed practitioner. See 21 U.S.C. § 353 (b)(1)(A) (2000); G. L. c. 94C, § 17 (*c*). As mentioned above, the Commonwealth's experts testified at trial that temazepam is a "Class 4" substance (can only be dispensed with a prescription from a licensed physician) and of all pharmaceuticals, benzodiazepines generate the third highest number of calls to the poison control center. The side effects of temazepam include impaired consciousness. An adult dose is

[21]See Webster's Third New Int'l Dictionary 329 (1993) (cantharides defined as "a preparation of dried beetles . . . used as a counterirritant and formerly as an aphrodisiac but being toxic when taken internally").

[22]See also *Mancuso* v. *Consolidated Edison Co.*, 56 F. Supp. 2d 391, 403 (S.D.N.Y. 1999) (fundamental tenet of toxicology is that the "dose makes the poison"); B.D. Goldstein & M.S. Henifin, Reference Guide on Toxicology, in Reference Manual on Scientific Evidence 401, 403 (2d ed. 2000) (one of three central tenets of toxicology is that "the dose makes the poison"); Merck Manual of Diagnosis and Therapy 1631, 2689 (16th ed. 1992) (describing medical treatment using benzodiazepines; characterizing benzodiazepines as poisons). Poison "is at best a relative word . . . the same substance is sometimes a medicine and sometimes a poison." W.F. Boos, The Poison Trail 56, 135-136 (1939) (a drug may be "used medicinally to cause a beneficial action" and as a "poison when the action is untoward").

thirty milligrams (fifteen milligrams for a person over fifty years of age), and an excessive dose can cause older persons to stop breathing. Two expert witnesses testified that combining temazepam with alcohol multiplies the impact of the drug. Therefore, the jury reasonably could find that, when secretly mixed with a drink and served to another, temazepam is a poison within the context of G. L. c. 265, § 28. See *Commonwealth* v. *Kennedy, supra* at 25 (whether substance constitutes poison is matter of inference).

Furthermore, because the evidence supported the inference that the defendant mixed the poison in the drinks knowing full well that the women would be impaired (the women testified to experiencing a sense of paralysis, having trouble walking, feeling sick or groggy, and all were rendered unconscious), the jury properly could conclude that the defendant had the requisite intent to injure. The fact that D.K., E.R., and M.N. recovered from their injuries is irrelevant, as proof of permanent, or substantial, injury is not an element of the statute. See *Commonwealth* v. *Dowler*, 414 Mass. 212, 216 (1993) (court may not construe statute to "creat[e] an additional element or defense where the Legislature has provided none").

3. *Proposed Mass. R. Evid. 405 (a).* At trial, the defendant sought to present three character witnesses.[23] The judge conducted an extensive voir dire of each witness and ruled that none of the witnesses provided a sufficient basis from which they could properly testify to the defendant's reputation for truthfulness.[24] The defendant does not contest the correctness of the judge's ruling, but instead urges this court to adopt Proposed Mass. R. Evid. 405 (a), which would permit character witnesses to testify not only about the defendant's reputation in the community, but also about their own opinion of the defendant's

[23]According to the defendant, the witnesses would have testified that the defendant had a reputation for truthfulness and they were "shocked" to hear of, or "couldn't believe," the allegations in this case.

[24]One of the witnesses, who knew the defendant for sixteen years at work and as a member of the YMCA, was allowed to testify that he visited the defendant at his apartment on a number of occasions without calling in advance.

character.[25] According to the defendant, rule 405 (a) would have more broadly permitted the witnesses to give their own opinion of the defendant's character, provided they were sufficiently familiar with him.

A defendant in a criminal case may present evidence of a good reputation with respect to the elements of the crime charged, in order to create a reasonable doubt of his guilt. *Commonwealth* v. *Belton*, 352 Mass. 263, 268, cert. denied, 389 U.S. 872 (1967), and cases cited. See *Commonwealth* v. *Roberts*, 378 Mass. 116, 129 (1979), and cases cited; *F.W. Stock & Sons* v. *Dellapenna*, 217 Mass. 503, 506 (1914) (reputation evidence must be based on reputation in community). See also G. L. c. 233, § 21A (reputation evidence may be based on reputation at place of work or business).[26] However, while evidence of a defendant's general reputation in his community or at his workplace is admissible, evidence in the form of private opinions is not. See *Commonwealth* v. *Belton, supra* at 269; P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence § 4.4.4, at 150 (7th ed. 1999) (witness must testify "as to the composite opinion of the defendant held by those likely to have observed a representative sample of his conduct"). See also *Commonwealth* v. *Benjamin*, 430 Mass. 673, 678 n.6 (2000); *Commonwealth* v. *Bumpus*, 362 Mass. 672, 681 (1972), vacated on other grounds, 411 U.S. 945 (1973), aff'd on rehearing, 365 Mass. 66 (1974) (isolated acts and personal opinions are not evidence of general reputation); *Commonwealth* v. *Baxter*, 267 Mass. 591, 593 (1929).

We reject the defendant's request to alter the settled law concerning the admission of character evidence. See *Com-*

[25]Proposed Mass. R. Evid. 405 (a), which is identical to the Federal rule, provides, in relevant part: "In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion."

[26]General Laws c. 233, § 21A, provides:

"Evidence of the reputation of a person in a group with the members of which he has habitually associated in his work or business shall be admissible to the same extent and subject to the same limitations as is evidence of such reputation in a community in which he has resided."

monwealth v. Mahar, 430 Mass. 643, 649 (2000) (court considers adoption of proposed rules on "case-by-case basis"). Unlike Proposed Mass. R. Evid. 806, adopted in the Mahar case, proposed rule 405 (a) has not "previously [been] cited . . . with favor"; is not "essentially consistent with common practice"; and does not "complement" the law governing the admission of character evidence. Contrast Commonwealth v. Mahar, supra at 649-650, quoting P.J. Liacos, Massachusetts Evidence § 8.4.3, at 481 (7th ed. 1999). It is difficult to see how testimony from a multitude of witnesses, each expressing his or her personal opinion of the defendant's character, would assist a jury. Personal opinions, without more, simply cannot substantiate a defendant's good character.[27]

4. *Joinder.* The defendant argues that the judge improperly permitted the Commonwealth to join for trial the indictments related to the three separate incidents at issue here. After conducting a pretrial hearing, the motion judge, who was not the trial judge, concluded that "the offenses charged are related offenses and that the defendant employed the same scheme and a consistent modus operandi in committing the offenses charged."

A judge is required to join offenses that "arise out of a course of criminal conduct or series of criminal episodes connected together," unless joinder is not in the best interests of justice. Mass. R. Crim. P. 9 (a) (1), (3), 378 Mass. 859 (1979). The propriety of joinder is a matter within the sound discretion of the trial judge. Commonwealth v. Sullivan, 436 Mass. 799, 803 (2002). The judge's decision will be reversed only if there has been "a clear abuse of discretion." Commonwealth v. Allison, 434 Mass. 670, 679 (2001). The defendant bears the burden of showing that joinder was improper. Commonwealth v. Wilson, 427 Mass. 336, 345 (1998), and cases cited.

---

[27]Moreover, there is no basis to believe that, even had the jury been allowed to hear the testimony of the three witnesses, a reasonable doubt would have been created in their minds. The Commonwealth presented very strong evidence that the defendant added temazepam to the drinks of the four victims and that he did so in order to have sexual relations with them. The contested issues at trial were whether he had actually raped M.N.; whether his behavior with regard to M.P. was wanton or reckless; and whether temazepam was a poison under G. L. c. 265, § 28.

The facts of this case demonstrate the defendant's participation in a series of criminal episodes that, despite slight factual variations, are sufficiently connected to support the judge's decision to allow the Commonwealth's request for joinder. See *Commonwealth* v. *Wilson, supra*; *Commonwealth* v. *Mamay*, 407 Mass. 412, 415, 417 (1990). In each episode, the defendant brought women to his home, drugged them with a drink containing a sleeping medication, and then engaged in conduct that could be construed as a sexual assault or attempted sexual assault.[28] See *Commonwealth* v. *Sullivan, supra* at 803-805.

In addition, the defendant has not demonstrated that the prejudice from joinder was "so compelling that it prevented him from obtaining a fair trial." *Commonwealth* v. *Wilson, supra* at 346-347 ("It is not enough for the defendant to show merely that his chances for acquittal would have been better had the indictments been tried separately"). See *Commonwealth* v. *Allison, supra* at 679-680, and cases cited; *Commonwealth* v. *Montanez*, 410 Mass. 290, 304 (1991). The judge "properly could conclude that prejudice, if any, to the defendant did not outweigh the interests of the court, the Commonwealth, and the public in a shortened adjudication," *Commonwealth* v. *Helfant*, 398 Mass. 214, 231 (1986), given that substantial scientific testimony would have had to be repeated if the motion for joinder had been denied. See *Commonwealth* v. *Sullivan, supra* at 803-805. The defendant's claim of prejudice "is also belied by the fact that evidence of his other offenses would have been admissible at separate trials on each indictment," *Commonwealth* v. *Allison, supra* at 680, to show the existence of a

[28]The defendant's argument that joinder was improper because the offenses occurred over a seventeen-month period and each involved different facts is without merit. Courts allow "considerable differences with respect to . . . factors [such as time and location] and other factual circumstances." *Commonwealth* v. *Wilson*, 427 Mass. 336, 345-346 (1998), and cases cited. *Commonwealth* v. *Mamay*, 407 Mass. 412, 417 (1990) (concluding eight-month time period does not make offenses unrelated where, "as here, there is such a similarity in the *method* by which the defendant committed the various offenses" [emphasis in original]). Minor factual variations, likewise, are not critical. *Id.* ("slight factual variations" in each case not controlling where all offenses took place in same location and defendant used same "scheme" in each case). See *Commonwealth* v. *Ferraro*, 424 Mass. 87, 89-90 (1997).

common plan or scheme of operations.[29] See, e.g., *Commonwealth* v. *King*, 387 Mass. 464, 472 (1982) (permitting admission of evidence of uncharged criminal behavior to show "common pattern or course of conduct"). Evidence of the prior episodes involving other victims was also relevant to prove the defendant's awareness of the risk of substantial harm involved when he administered the fatal mixture of alcohol and temazepam to M.P. Furthermore, there is no indication that the jury improperly applied evidence of one charge toward the other, especially in light of the fact that the defendant was acquitted of raping M.N.[30] See *Commonwealth* v. *Sosnowski*, 43 Mass. App. Ct. 367, 372 (1997) (difficult to find that admission of evidence caused prejudice where defendant was acquitted on two of three indictments). In sum, the defendant has not demonstrated that the offenses were unrelated or that he was unfairly prejudiced. The joinder was proper.

5. *Prior bad acts.* Over the defendant's objection, the judge allowed the Commonwealth to introduce the testimony of V.H. V.H. testified that on one occasion, she visited the defendant at his apartment. He served her an alcoholic drink, and after she consumed it, she fell asleep. During another visit to the defendant's apartment in November, 1996, the defendant gave V.H. an alcoholic drink. After V.H. consumed the drink, the defendant showed her a green gown and suggested that she put it on. V.H. put on the gown, began to feel "whoozy and sweaty," fell asleep, and woke up the following morning wear-

---

[29]This issue is discussed in more detail *infra*.

[30]The defendant's argument that joinder was improper because his defenses with respect to each charge were different also fails. See *Commonwealth* v. *Allison*, 434 Mass. 670, 680 (2001) ("It is not enough for the defendant simply to assert that he wanted to testify about some charges but not others." The defendant must make a "convincing showing that he had both important testimony to give concerning one count and a strong need to refrain from testifying about the other count." *Id.*, quoting *Commonwealth* v. *Williams*, 18 Mass. App. Ct. 945, 947 (1984). The defendant failed to make the necessary showing. His defense to all charges was that he did not put prescription medicine into any of the victims' drinks. See *Commonwealth* v. *Gagnon*, 45 Mass. App. Ct. 584, 591 (1998) (rejecting claim of separate defense theory for each victim where overarching defense strategy was that both victims fabricated charges).

ing the green gown but no underwear.[31] V.H. testified that she knew that she had engaged in sexual intercourse because she was "all wet down there."[32]

On appeal, the defendant concedes that V.H.'s testimony could have been admissible as evidence of a common scheme or pattern of operation, see *Commonwealth* v. *Helfant*, 398 Mass. 214, 224-225 (1986), and cases cited. He argues, however, that its prejudicial effect outweighed its probative value and made its admission improper. This assertion is without merit.

Evidence of a defendant's prior or subsequent bad acts is inadmissible to demonstrate bad character or propensity to commit the crime charged. See, e.g., *Commonwealth* v. *Barrett*, 418 Mass. 788, 793 (1994), and cases cited. However, such evidence "may be admissible, if relevant, to show a common scheme or course of conduct, a pattern of operation, absence of accident or mistake, intent, or motive." *Id.* at 793-794. To be admissible, "evidence of uncharged conduct must usually be related in time, place, and/or form to the charges being tried. There must be, in other words, a sufficient nexus to render the conduct relevant and probative." P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence § 4.4.6, at 155 (7th ed. 1999). In the circumstances of this case, the evidence of the defendant's behavior toward V.H. properly was admitted to show a common scheme or pattern of conduct, *Commonwealth* v. *Feijoo*, 419 Mass. 486, 495 (1995); *Commonwealth* v. *Helfant, supra*; *Commonwealth* v. *Fleury-Ehrhart*, 20 Mass. App. Ct. 429, 430-431 (1985), because it was sufficiently related in time, place, and form to the charges being tried. *Commonwealth* v. *Hanlon*, 44 Mass. App. Ct. 810, 818-819 (1998), and cases cited. See *Commonwealth* v. *Barrett, supra* at 794; *Commonwealth* v. *Myer*, 38 Mass. App. Ct. 140, 143-144 (1995). Furthermore, any prejudice from V.H.'s testimony was sufficiently ameliorated by the judge's limiting instructions, given immediately after the testimony and repeated during the final instructions. *Commonwealth* v. *McGeoghean*, 412 Mass. 839, 842 (1992) (limiting instruction "tends to offset any improper prejudicial effect

---

[31]V.H. testified that she took diabetes and blood pressure medications. Neither of her medications was a benzodiazepine.

[32]No charges were brought with respect to this incident.

of evidence that might be thought to show the defendant's bad character or propensity for violent acts and focuses the jury's attention on the proper application of the evidence"). See P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence, *supra* at § 4.4.6, at 157.

6. *Inconsistent verdicts.* Finally, the defendant argues that his conviction of manslaughter must be reversed because it is legally inconsistent with the conviction of mingling poison with food or drink with the intent to kill or injure under G. L. C. 265, § 28. He contends that, because mingling poison with food or drink requires a specific intent to kill or injure another person, proof of that crime "stands opposed" to the concept within involuntary manslaughter that the killing be unintentional. We disagree.

A defendant is entitled to relief "only where verdicts are legally inconsistent — i.e., where, removed from the factual context of the particular case, the government could not possibly have proved the elements of both crimes with respect to the defendant." *Commonwealth* v. *Elliffe*, 47 Mass. App. Ct. 580, 584 (1999). The crime of mingling poison with food or drink may be proved by a showing of intentional conduct with either a specific intent to kill or a specific intent to injure. An involuntary manslaughter conviction requires proof of intentional wanton or reckless conduct, resulting in an unintentional killing. *Commonwealth* v. *Welansky*, 316 Mass. 383, 398 (1944) ("What must be intended is the conduct, not the resulting harm"). That the latter does not involve a wilful intention to cause the resulting harm (death) in no way makes it incompatible with the former.

The jury concluded that the defendant intentionally gave each of his victims a drink laced with poison with a specific intent of injuring them by inducing a state of unconsciousness that would render them unable to fend off or to remember his sexual assaults. See *Commonwealth* v. *Hammond*, 50 Mass. App. Ct. 171, 175-176 (2000) (definition of "injury" broad enough to include both physical injury and harm to person's mind). One victim died. As explained by the Appeals Court, "[t]he conduct that establishes a violation of G. L. c. 265, § 28, is [] precisely the same conduct that constitutes the act under the manslaughter

charge that was done with disregard for the high degree of likelihood that substantial harm would result to that individual." *Commonwealth* v. *Walker*, 60 Mass. App. Ct. 255, 270 (2004). In sum, the crimes of mingling poison with food or drink and involuntary manslaughter "are not mutually exclusive, and, therefore, the verdicts are not impossible as a matter of law." *Commonwealth* v. *Chandler*, 29 Mass. App. Ct. 571, 580 (1990).

*Conclusion.*

For the foregoing reasons, we conclude that there was sufficient evidence to support the defendant's conviction of involuntary manslaughter, and that temazepam constitutes a poison under G. L. c. 265, § 28. Furthermore, we conclude that the judge did not err in excluding character evidence proffered by the defendant, in joining the indictments, and admitting evidence of the defendant's prior bad conduct. Finally, the manslaughter conviction is not inconsistent with the conviction for mingling poison with drink. Accordingly, we affirm the convictions.

*So ordered.*