NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12617


COMMONWEALTH  vs.  JESSE CARRILLO.



Hampshire.     February 4, 2019. - October 3, 2019.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher, &
Kafker, JJ.


Homicide.  Controlled Substances.  Wanton or Reckless Conduct.
    Practice, Criminal, Request for jury instructions.




    Indictments found and returned in the Superior Court
Department on September 28, 2015.

    The cases were tried before John A. Agostini, J.

    The Supreme Judicial Court granted an application for
direct appellate review.


    J.W. Carney, Jr. (Reyna Ramirez also present) for the
defendant.
    Cynthia M. Von Flatern, Assistant District Attorney (Jeremy
C. Bucci, Assistant District Attorney, also present) for the
Commonwealth.
    Leo Beletsky, of New York, & Lisa Newman-Polk, for
Committee for Public Counsel Services & others, amici curiae,
submitted a brief.
    Maura Healey, Attorney General, & Randall E. Ravitz,
Assistant Attorney General, for the Attorney General, amicus
curiae, submitted a brief.

GANTS, C.J.  In October 2013, Eric Sinacori, a twenty year old junior at the University of Massachusetts in Amherst, died from a heroin overdose.  His death was yet another tragic loss of a promising young adult whose life was cut short by the proliferation of heroin and other opioids that have ravaged communities across the Commonwealth.  The defendant, a graduate student at the university, had provided him with the heroin that caused his death.  Following a jury trial, the defendant was convicted of involuntary manslaughter and distribution of heroin.  We granted the defendant's application for direct appellate review.

On appeal, the defendant raises two arguments.  First, he contends that the Commonwealth presented insufficient evidence to support the involuntary manslaughter conviction.  Second, he claims that he is entitled to a new trial on the indictment charging distribution of heroin because the judge erred in denying his request to instruct the jury on the lesser included offense of possession of heroin for personal use.

To find a defendant guilty of involuntary manslaughter caused by wanton or reckless conduct, our case law requires proof beyond a reasonable doubt that the defendant engaged in conduct that creates "a high degree of likelihood that substantial harm will result to another." Commonwealth v. Welansky, 316 Mass. 383, 399 (1944).  Selling or giving heroin

to another person may be wanton or reckless conduct where, under the circumstances, there is a high degree of likelihood that the person will suffer substantial harm, such as an overdose or death, from the use of those drugs.  And in many cases the circumstances surrounding the distribution of heroin will permit a rational finder of fact to find beyond a reasonable doubt that the transfer of heroin created a high degree of likelihood of substantial harm, such as an overdose or death.  But not every case will present circumstances that make such conduct "wanton or reckless."  This is one such case.

We conclude that the mere possibility that the transfer of heroin will result in an overdose does not suffice to meet the standard of wanton or reckless conduct under our law.  The Commonwealth must introduce evidence showing that, considering the totality of the particular circumstances, the defendant knew or should have known that his or her conduct created a high degree of likelihood of substantial harm, such as an overdose or death.

Here, no evidence was presented during the Commonwealth's case-in-chief that would permit a reasonable jury to conclude that the inherent possibility of substantial harm arising from the use of heroin -- which is present in any distribution of heroin -- had been increased by specific circumstances to create a high degree of likelihood of substantial harm.  For instance,

the Commonwealth did not present evidence that the defendant knew or should have known that the heroin was unusually potent or laced with fentanyl; evidence that Sinacori was particularly vulnerable to an overdose because of his age, use of other drugs, or prior overdoses; or evidence that the defendant knew or should have known that Sinacori had overdosed but failed to seek help. In the absence of any such evidence, we conclude that the Commonwealth did not meet its burden of producing sufficient evidence for a reasonable jury to conclude that the defendant's conduct in this case created a high degree of likelihood that Sinacori would suffer substantial harm, such as an overdose or death, from his use of the heroin. The defendant's conviction of involuntary manslaughter must therefore be vacated, and a required finding of not guilty entered.

We affirm the defendant's conviction of distribution of heroin. We conclude that, in the circumstances of this case, the judge did not err in denying the defendant's request for a lesser included jury instruction on simple possession, even though Sinacori asked the defendant to purchase heroin for him and the defendant did not profit from the sale. Where the defendant traveled alone to New York to obtain the heroin that he later sold to Sinacori, and where Sinacori played no active role in the purchase of those drugs, no reasonable jury could

conclude that the defendant was anything other than a "link in the chain" of distribution of the heroin, rather than merely a joint possessor of the heroin for personal use.[1]

Discussion. 1. Involuntary manslaughter. We consider first whether the evidence was sufficient to support a finding of involuntary manslaughter beyond a reasonable doubt by a reasonable trier of fact. Because the defendant moved for a required finding of not guilty at the close of the Commonwealth's case, we review the sufficiency of only the evidence presented at the time the Commonwealth rested after its case-in-chief, viewing that evidence in the light most favorable to the Commonwealth. Commonwealth v. Berry, 431 Mass. 326, 330, 332 (2000) (sufficiency of evidence determined "by an examination of the evidence at the close of the Commonwealth's case-in-chief"). We reserve discussion of the evidence offered by the defendant after the Commonwealth rested for our analysis of his challenge to the judge's denial of his request for a jury instruction on the lesser included offense of possession of heroin for personal use.

---

[1] We acknowledge the amicus briefs submitted by the Attorney General and by the Committee for Public Counsel Services, The Health in Justice Action Lab at Northeastern University School of Law, and Massachusetts Association of Criminal Defense Lawyers.

a.  The evidence viewed in the light most favorable to the Commonwealth.  In the fall of 2013, the defendant and Sinacori lived in the same neighborhood in Amherst.  Both were heroin users.  Based on the text messages presented in evidence, a reasonable fact finder could have inferred that the defendant met Sinacori shortly before September 30, 2013, and Sinacori learned that the defendant periodically traveled to purchase heroin.  In a text message sent on September 30, Sinacori asked the defendant when he was making "the next run."  Sinacori indicated he would be willing to purchase "another bun" of heroin[2] when the defendant made that "run."  The defendant said he could provide two "buns" for $180, but if Sinacori wanted only one "bun," it would cost one hundred dollars.  The defendant also sent a text message to Sinacori that he would have to pay in advance.

They arranged to meet on October 1, when the defendant left Massachusetts to travel to the Bronx borough of New York to pick up the "buns."  During the defendant's trip, the defendant told Sinacori that he was also going to a drug store to purchase a

---

[2] The jury could infer through the totality of the evidence presented by the Commonwealth in its case-in-chief that a "bun" referred to a ten-bag "bundle" of heroin that cost one hundred dollars.  This was later confirmed by the defendant in his testimony.

"new rig";[3] Sinacori sent a text message that he would like to split a "10 pack" with the defendant, unless the defendant needed them all. The defendant, upon his return, invited Sinacori to his apartment to "[d]o some."

Sinacori went to the defendant's apartment that evening and used heroin with the defendant. Later that night, Sinacori asked the defendant in a text message if he "could get another bun tomorrow." The defendant replied that if he were to "let go one from [his] headstash," he would charge "mad dollar" for it. Sinacori agreed to wait for the defendant's next trip; the defendant replied by text that he would be leaving at 5 P.M. on October 3. Sinacori gave the defendant seventy dollars before the defendant left on his trip, and asked the defendant to "spot" him thirty dollars. The defendant drove to the Bronx to buy heroin. At 8:44 P.M. that evening, the defendant sent Sinacori a text message stating, "Candy acquired," and added that he was on his way back. Later, the defendant sent a text message that he was delayed because of traffic in Hartford, Connecticut. Sinacori replied that his "veins are crying" and that he was hurting. At 11:40 P.M., the defendant sent a text message that he knew that Sinacori was "hurtin but u will very

---

[3] Although the Commonwealth did not explain or introduce evidence as to what a "rig" is in this context, it refers to "slang for a hypodermic needle and syringe used to inject heroin." State v. Ferrell, 2017-Ohio-9341 ¶16 (Ohio Ct. App.).

soon be in the loving comforting arms of Miss H."  The defendant said he would drive to Sinacori's home so that Sinacori would not "have to go far in hurt mode."  As he approached, the defendant asked Sinacori whether he had the balance of thirty dollars; Sinacori sent a text message that he only had twenty dollars.  They agreed that either the defendant would give him "nine," inferably referring to nine out of ten bags of heroin, or Sinacori would get the remaining ten dollars the next day.  The defendant arrived at Sinacori's home just before midnight, and at 12:20 A.M sent a text message to Sinacori to ask, "Ehh??? ;)" and "How much tropicana did u drink?," which inferably was asking him how much heroin he had used.[4]  Sinacori did not reply to either text.

On the afternoon of October 4, Sinacori's father entered his son's apartment and found his son dead, with a used needle nearby.  The police found three waxed bags with a Tropicana stamp that had been torn open, and six more bags that had not been opened.  The analyst at the drug laboratory found that the bags contained heroin with a purity range of "roughly from [fifty-eight] to [sixty-nine] percent."  The autopsy conducted by the medical examiner revealed that the cause of death was "acute heroin intoxication."  A toxicology specialist testified

---

[4] The brand of heroin purchased by the defendant bore the mark "Tropicana" on its packaging.

that the opiate found in Sinacori's blood was heroin and that no fentanyl was present in the blood.

From this evidence, a reasonable jury could have inferred that the defendant and Sinacori on October 1 together used the heroin the defendant had procured earlier that day from the Bronx. Two days later, the defendant traveled again to the Bronx to obtain a "bun" of heroin for Sinacori, and more heroin for himself. When the defendant was traveling through Hartford on his way back to Amherst, Sinacori was suffering from withdrawal pain. The defendant delivered nine bags of heroin to Sinacori that night, omitting one bag because Sinacori had apparently not paid the remaining ten dollars he owed to the defendant. Sinacori used three of those bags and this time overdosed, causing his death.

The Commonwealth contends that this evidence reveals at least two circumstances showing that the defendant knew or should have known that his conduct was wanton or reckless. First, there was evidence from the text messages that Sinacori was suffering from withdrawal symptoms ("my veins are crying") before he used the heroin, and the Commonwealth argues that the defendant should have known that an addicted person in withdrawal is more likely to overdose. But there was no expert evidence -- or even lay testimony -- that a heroin user is more likely to overdose when he or she is suffering from withdrawal.

We cannot reasonably take judicial notice that this is true, or that the defendant or a reasonable person would know it to be true.

Second, the Commonwealth claims that when his text to Sinacori at 12:20 A.M. asking, "How much tropicana did u drink?" went unanswered, the defendant should have recognized that Sinacori had overdosed and immediately sought help. We decline to give so much inferential weight to the failure of a person to respond to such a text message.

In sum, there was no evidence that the defendant knew or should have known that the transfer of heroin to Sinacori created a high degree of likelihood of substantial harm, such as an overdose or death. As discussed in greater detail infra, where courts in drug-induced homicide cases have found the evidence sufficient to support a conviction of involuntary manslaughter, there generally has been evidence of specific circumstances that a reasonable person would understand to heighten the risk of harm, such as where the drugs were unusually potent, the user was particularly vulnerable to an overdose, or the defendant failed to seek help after the user became unconscious or unresponsive. Of course, this list is not exhaustive of all the circumstances that may increase the risk of serious harm.

In this case, however, the Commonwealth proved little more than the fact that heroin was transferred from one person to another. Here, the heroin in question was not laced or tainted with fentanyl; the defendant purchased the same brand of heroin for his own personal use; the defendant observed Sinacori use the same brand of heroin two days earlier without apparent problem; the defendant did not personally inject Sinacori with heroin or any other drugs; there is no evidence that the defendant had any knowledge of any other drug or alcohol use by Sinacori that could have increased the likelihood of an overdose; and the defendant did not observe Sinacori overdose and fail to call for help. Nor was there any expert testimony regarding the relative potency of heroin of the purity that the drug laboratory analyst found, or regarding the likelihood that heroin of that purity would result in an overdose.

The issue we confront, then, is whether evidence of heroin distribution alone is sufficient to support a conviction of involuntary manslaughter where the heroin caused a tragic death.

b. Wanton or reckless conduct in the context of a transfer of heroin. "Involuntary manslaughter is 'an unlawful homicide unintentionally caused by an act which constitutes such a disregard of probable harmful consequences to another as to amount to wanton or reckless conduct.'" Commonwealth v. Life Care Ctrs. of Am., Inc., 456 Mass. 826, 832 (2010), quoting

Commonwealth v. Gonzalez, 443 Mass. 799, 808 (2005). Our model homicide instructions, adopting language from Commonwealth v. Welansky, 316 Mass. at 399, provide that "[w]anton or reckless conduct is conduct that creates a high degree of likelihood that substantial harm will result to another." Model Jury Instructions on Homicide 88 (2018) (involuntary manslaughter). See Welansky, supra ("The essence of wanton or reckless conduct is intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another"). In determining what actions are wanton or reckless, we focus on "the conduct that caused the result, . . . not the resultant harm" (emphasis added). Commonwealth v. Hardy, 482 Mass. 416, 424 (2019).

The phrase -- "a high degree of likelihood that substantial harm will result to another" -- separates wanton or reckless conduct from the unreasonable risk of harm that constitutes negligence or gross negligence. As this court declared in Welansky, 316 Mass. at 399: "The words 'wanton' and 'reckless' are thus not merely rhetorical or vituperative expressions used instead of negligent or grossly negligent. They express a difference in the degree of risk and in the voluntary taking of risk so marked, as compared with negligence, as to amount substantially and in the eyes of the law to a difference in

kind."  The risk of harm must be more than a possible or unreasonable risk; it must reach a "high degree of likelihood."  See id.  See also id. at 397 ("Usually wanton or reckless conduct consists of an affirmative act, like driving an automobile or discharging a firearm, in disregard of probable harmful consequences to another" [emphasis added]).  And the harm to another person must be substantial, involving death or grave bodily injury.  See Sandler v. Commonwealth, 419 Mass. 334, 336 (1995) ("The risk of death or grave bodily injury must be known or reasonably apparent, and the harm must be a probable consequence of the defendant's election to run that risk").

Where the Commonwealth alleges that a defendant committed involuntary manslaughter by selling or giving heroin to another person, who died from its use, the distribution of that heroin must be proven to be wanton or reckless conduct, which means that the distribution must have created a high degree of likelihood of death or grave bodily injury.  The most common risk of death or grave bodily injury from the distribution of heroin arises from the risk of an overdose.  See National Institutes of Health:  National Institute on Drug Abuse, Drug Facts:  Heroin (revised June, 2019), https://www.drugabuse .gov/publications/drugfacts/heroin [https://perma.cc/G43Q-6R6W] (noting that heroin overdose results in "breathing [that] slows or stops, . . . decreas[ing] the amount of oxygen that reaches

the brain, a condition called hypoxia[,] [which] can have short- and long-term effects and effects on the nervous system, including coma and permanent brain damage"). We recognize that every use of heroin presents the possibility of an overdose causing death or grave bodily injury, but "a high degree of likelihood" of death or grave bodily injury requires more than the mere possibility of an overdose; it requires proof of a high degree of likelihood of an overdose. See Lofthouse v. Commonwealth, 13 S.W.3d 236, 241 (Ky. 2000) (conviction of reckless homicide based on transfer of illegal drugs "required proof beyond a reasonable doubt that there was a substantial and unjustifiable risk that [the victim] would die if he ingested the cocaine and heroin furnished to him by [the defendant]"); State v. Shell, 501 S.W.3d 22, 32-33 (Mo. Ct. App. 2016) (to prove involuntary manslaughter based on transfer of heroin, "it was incumbent upon the State to prove, beyond a reasonable doubt, that [d]efendant was aware of the risk that [d]ecedent's death was probable as a result of injecting heroin").[5]

---

[5] We recognize that, in some circumstances, such as where the health of the user is already fragile, or the user employs contaminated needles, the use of heroin might pose a risk of death or grave bodily injury even without an overdose. We need not address that possibility here, where there was no evidence that Eric Sinacori's health was impaired or that any equipment he used to inject heroin was contaminated.

Similarly, we also recognize that there may be circumstances where a defendant provides heroin to a user who

Our model jury instructions also provide:

"If the defendant realized the grave risk created by his conduct, his subsequent act amounts to wanton or reckless conduct whether or not a reasonable person would have realized the risk of grave danger. Even if the defendant himself did not realize the grave risk of harm to another, the act would constitute wanton or reckless conduct if a reasonable person, knowing what the defendant knew, would have realized the act posed a risk of grave danger to another."

Model Jury Instructions on Homicide, supra at 89-90. Therefore, to prove a defendant guilty of involuntary manslaughter in these circumstances, the Commonwealth must prove not only that the defendant's conduct created a high degree of likelihood that the user would overdose from the heroin, but also that the defendant knew of this high degree of likelihood or should have known of it, given his own personal knowledge and experience.

c. Massachusetts case law. "Perhaps it is a testament to prosecutorial discretion, trial judges properly dismissing cases based on insufficient evidence, and juries conscientiously performing their function that we have had few occasions to

_____

overdoses in the presence of the defendant, and the defendant fails to seek medical attention or other help to the overdose victim, who dies. In these circumstances, even if there was not a high degree of likelihood of an overdose, the failure of the person who provided the heroin that caused the overdose to exercise reasonable care to prevent the overdose victim from dying may be sufficient to support a conviction of voluntary manslaughter. See Commonwealth v. Levesque, 436 Mass. 443, 450 (2002) ("Where a defendant's failure to exercise reasonable care to prevent the risk he created is reckless and results in death, the defendant can be convicted of involuntary manslaughter").

review convictions on the basis that the evidence was insufficient to prove 'wanton or reckless' conduct." Hardy, 482 Mass. at 423. We have decided three cases where a defendant was prosecuted for involuntary manslaughter after providing heroin to a person who died from an overdose. Two were full opinions: Commonwealth v. Catalina, 407 Mass. 779 (1990), and Commonwealth v. Auditore, 407 Mass. 793 (1990). The other, Commonwealth v. Perry, 416 Mass. 1003 (1993), was a short rescript opinion in which we adopted the analysis of the Appeals Court from the same case.

In each of these cases, the issue before the court was whether the evidence before the grand jury was sufficient to support the probable cause needed for an indictment, not whether the evidence was sufficient to support a conviction of involuntary manslaughter. See Auditore, 407 Mass. at 796 ("Emphasizing that we are dealing only with the standard of probable cause"); Catalina, 407 Mass. at 789-790 ("The defendant has not yet been tried on this charge, so we are not concerned with whether sufficient evidence exists to warrant a finding of his guilt beyond a reasonable doubt. Rather, we consider only whether the information before the grand jury was adequate to establish his identity and probable cause to arrest him for the crime charged"). See also Perry, 416 Mass. at 1003-1004. This is the first case of involuntary manslaughter based on the

transfer of drugs where we address the sufficiency of the evidence to support a finding of proof beyond a reasonable doubt, rather than probable cause.

The standard for probable cause "is a relatively low threshold, requiring only sufficiently trustworthy information to instill in a reasonable person the requisite belief of criminality" (quotations and citation omitted). Paquette v. Commonwealth, 440 Mass. 121, 132 (2003), cert. denied, 540 U.S. 1150 (2004). Yet in finding probable cause in Catalina, 407 Mass. at 790 n.12, we noted that "there was evidence that the defendant knew he was distributing a highly potent brand of heroin, that [the deceased] had a low tolerance for the drug and had overdosed in the past, that she could not handle a whole bag of this type of heroin, and that she needed to be warned not to 'do a whole one.'" In finding probable cause in Auditore, 407 Mass. at 796, we noted that the brand of heroin sold by the defendant "was twice as strong as the average dose," that he had a supply of this brand of heroin in his apartment in Gloucester, and that this brand of heroin "had caused at least two deaths by overdose in the Gloucester area." And in finding probable cause in the rescript opinion in Perry, 416 Mass. at 1004, we simply adopted the reasons advanced by the Appeals Court. In the Appeals Court opinion, it was noted that there was evidence that the defendant knew that the heroin she had obtained for the

deceased was unusually dangerous; the defendant, after she learned that the deceased had collapsed after injecting himself, commented, "That's what happens when you get good stuff." Commonwealth v. Perry, 34 Mass. App. Ct. 127, 130 (1993). Consequently, even though the court in these cases was determining only whether there was probable cause to support an indictment for involuntary manslaughter, the court noted circumstances in each of those cases that are not present here -- facts that a reasonable person would understand to increase the risk of substantial harm.

Two reported decisions by the Appeals Court have upheld convictions of involuntary manslaughter where the defendant provided illegal drugs to another person who overdosed and died. In both cases, there was specific evidence that the defendant knew or should have known that his or her conduct created a high degree of likelihood of substantial harm to another.

In Commonwealth v. Osachuk, 43 Mass. App. Ct. 71, 72 (1997), the Appeals Court affirmed an involuntary manslaughter conviction where the defendant, having earlier provided the victim with methadone and having loaned her money to purchase cocaine, provided the victim with heroin, knowing that she intended to mix it with cocaine to produce a "speed ball," and then after she became unconscious, personally injected her with more cocaine to try to wake her up. "[E]xperts for both the

Commonwealth and the defense agreed that the results of blood tests were consistent with death caused by cocaine, heroin and methadone intoxication." Id. at 73. Perhaps because of the weight of the evidence, the defendant on appeal challenged only the sufficiency of the evidence as to causation, and did not challenge whether the defendant's conduct was wanton or reckless.[6] Id. at 71.

In Commonwealth v. Vaughn, 43 Mass. App. Ct. 818, 819-820 (1997), the defendant injected the victim with heroin and, after she passed out and became unresponsive, left her alone "for some time," returned and slapped her in an effort to rouse her, and when that failed, he "went back downstairs and watched television." See id. at 825-826 (jury could infer defendant's subjective awareness of risks of injecting heroin from his conduct after victim passed out).

Another case, Commonwealth v. Walker, 442 Mass. 185 (2004), merits attention, although it did not concern the transfer of heroin. In Walker, the defendant repeatedly mixed a high dose of sleeping medication -- which contained a benzodiazepine called temazepam -- into drinks that he prepared for various women. Id. at 187-189 & n.3. Eventually, one woman died from a combination of temazepam and alcohol. Id. at 189. We affirmed

---

[6] The defendant here does not challenge the causal link between his conduct and Sinacori's death.

the jury's conviction of involuntary manslaughter.  Id. at 204. In so doing, we identified the specific evidence that proved that the defendant knew or should have known that his conduct created a high degree of likelihood that substantial harm would result.  We noted first that the defendant used a particularly high dose, and that the Commonwealth introduced testimony from an expert who testified as to the toxicity of the dose the defendant administered.  Id. at 189, 192.  Importantly, we also noted that the defendant had engaged in such conduct on previous occasions and "watched [the] injurious effects take hold," and that he thus should have understood that his actions would likely "be toxic, if not lethal."  Id. at 193.

The case now before us is unique, not only because it is the first time we have addressed the sufficiency of the evidence for an involuntary manslaughter conviction based on the distribution of heroin, but also because it is the first time we have confronted such a case where there was no evidence, for example, of the unusual potency of the heroin, of the vulnerability of the user to an overdose, or of the defendant's failure to seek help when the user appeared to overdose.

The Commonwealth contends that we have already decided that the distribution of heroin of unknown strength alone, without more, is sufficient to support a conviction of involuntary

manslaughter.  In making this argument, the Commonwealth relies upon our statement in Perry:

> "In Commonwealth v. Catalina, 407 Mass. 779, 790-791 (1990), . . . we held that the distributing of a particularly potent form of heroin to one who injected it and died as a result constituted evidence sufficient for an indictment by a grand jury of manslaughter.  See [id.] at 790 n.12.  However, we did not limit the effect of this rule to that specific form of heroin because all heroin of unknown strength is inherently dangerous and carries a 'high probability that death will occur.'  Id. at 791, quoting with approval People v. Cruciani, 70 Misc. 2d 528, 536 (N.Y. [Suffolk Co. Ct.] 1972)."

Perry, 416 Mass. at 1004.

The last sentence of this statement is dictum; in Catalina, as earlier noted, we identified considerable evidence that the defendant should have recognized would result in substantial harm, and therefore did not need to address whether the indictment could survive without any such evidence.  But it is admittedly powerful dictum because, if it is true that the use of "all heroin of unknown strength . . . carries 'a high probability that death will occur,'" then the distribution of heroin alone would suffice to support a finding of wanton or reckless conduct because it would always create "a high degree of likelihood that substantial harm will result to another." And we note that at least one other State court has relied on this language from our Catalina and Perry opinions for the proposition that, in Massachusetts, the distribution of heroin alone is sufficient to support a guilty finding of involuntary

manslaughter where the heroin causes the user's death.  See
State v. Miller, 874 N.W.2d 659, 664 (Iowa App. 2015).  We now
reject that proposition.

The Commonwealth put forth no evidence at trial that the
use of heroin generally carries a "high probability" of death or
even overdose.  In the absence of such evidence, if the
assertion that "all heroin of unknown strength . . . carries 'a
high probability that death will occur'" is to be used to
support the sufficiency of evidence at trial, a reasonable
person must know this to be true.  But we cannot infer that a
reasonable person would know this to be true unless it indeed is
true.  Neither this court in Perry or Catalina, nor the New York
trial court in Cruciani, where the statement originated,
provided any empirical factual support for that statement.[7]

---

[7] In the New York case cited by the court, People v.
Cruciani, 70 Misc. 2d 528, 529, 537 (N.Y. Suffolk Co. Ct. 1972),
the trial judge denied the defendant's motion to dismiss the
counts in the indictment charging reckless manslaughter in the
second degree and criminally negligent homicide.  It is
noteworthy that, after the defendant was convicted of reckless
manslaughter, the Court of Appeals of New York, in affirming the
conviction, rejected the defendant's claim that the evidence of
recklessness was insufficient by noting that "the proof
show[ed], among other things, that defendant Cruciani injected
[the victim] with heroin (1) when, in his own words, she was
already 'completely bombed out on downs' (depressants like
morphine into which heroin is rapidly converted by the body's
metabolic processes), (2) at a time when she had lost the
capacity to 'walk or talk straight', and (3) despite his
admission of awareness that there was a substantial possibility
that a further injection in her then drug-saturated state would
cause her to 'fall out' (in modern vernacular of drug users,

Heroin is undoubtedly an inherently dangerous drug, and heroin overdoses have undoubtedly caused a tragic number of deaths. See Massachusetts Department of Public Health, Data Brief: Opioid-Related Overdose Deaths among Massachusetts Residents, at 2 (Feb. 2019), https://www.mass.gov/files/documents/2019/02/12/Opioid-related-Overdose-Deaths-among-MA-Residents-February-2019.pdf [https://perma.cc/2Z2Z-RN2W] (over 1,000 Massachusetts residents died from opioid-related overdoses each year between 2014 and 2018). But we can find no evidence -- nor has the Commonwealth pointed us to any -- proving that any use of heroin of unknown strength carries a "high probability" of substantial harm, such as an overdose or death. According to recent data gathered by the Substance Abuse and Mental Health Services Administration, in 2017 approximately 652,000 Americans suffered from "heroin use disorder," which is defined as "clinically significant impairment caused by the recurrent use of heroin." Substance Abuse and Mental Health Services Administration, Key Substance Use and Mental Health Indicators in the United States: Results from the 2017 National Survey on Drug Use and Health 33 (2017), https://www.samhsa.gov/data/sites/default/files/cbhsq-reports/NSDUHFFR2017/NSDUHFFR2017.pdf [https://perma.cc/V92Q-2DJ8]. And 886,000

---

that she would die)." People v. Cruciani, 36 N.Y.2d 304, 305 (1975).

Americans used heroin that year.  Id. at 19.  Among those individuals, the Centers for Disease Control and Prevention reported 15,482 drug overdose deaths involving heroin.  National Institutes of Health:  National Institute on Drug Abuse, Overdose Death Rates (revised Jan. 2019), https://www.drugabuse .gov/related-topics/trends-statistics/overdose-death-rates [https://perma.cc/2ZC8-X7NN].  This is, of course, a national tragedy.  But as devastating as the heroin epidemic has been, we cannot rationally conclude from this data that every single instance of heroin distribution carries a "high probability" that the user will die.

The rate of overdose, of course, is higher than the rate of death.  Reliable data regarding the incidence of overdoses (or the ratio of overdoses to deaths) is more difficult to obtain than data regarding the incidence of death, because so many overdoses are unreported.  The Centers for Disease Control and Prevention has estimated that in 2015, 81,326 emergency department visits occurred for "heroin-related poisonings" in the United States, a year in which 12,989 individuals were reported to have died from drug overdoses involving heroin.  See Centers for Disease Control and Prevention, 2018 Annual Surveillance Report of Drug-Related Risks and Outcomes 19, https://www.cdc.gov/drugoverdose/pdf/pubs/2018-cdc-drug-surveillance-report.pdf [https://perma.cc/23PU-QN3B]; Rudd,

Seth, David, & Scholl, Increases in Drug and Opioid-Involved Deaths -- United States, 2010-2015, 65 MMRW 1445, 1450 (Dec. 30, 2016).  But even if we recognize that the rate of overdose substantially exceeds the rate of death, we still could not reasonably assume that all heroin of unknown strength carries a high probability that overdose will occur, or that a reasonable person would know that to be true.  It is fair to assume that a reasonable person would know that the use of heroin of unknown strength is inherently dangerous and carries a significant possibility of overdose or death.  But to suggest that a reasonable person would know that any use of heroin carries a high probability or a substantial likelihood of overdose or death is a bridge too far.[8]

---

[8] It is worthy of note that the dramatic increase in the overdose death rate over the past decade is mainly attributable to the widespread introduction of synthetic fentanyl.  See National Institutes of Health:  National Institute on Drug Abuse, Overdose Death Rates (revised Jan. 2019), https://www.drugabuse.gov/related-topics/trends-statistics/overdose-death-rates [https://perma.cc/2ZC8-X7NN].  According to the Massachusetts Department of Public Health, "[a]mong the 1,902 [Massachusetts] opioid-related overdose deaths in 2018 where a toxicology screen was also available, 1,695 of them (89%) had a positive screen result for fentanyl.  In the fourth quarter of 2018, heroin or likely heroin was present in approximately 32% of opioid-related overdose deaths that had a toxicology screen." Massachusetts Department of Public Health, Data Brief:  Opioid-Related Overdose Deaths among Massachusetts Residents 2(May 2019), https://www.mass.gov/files/documents/2019/05/15/Opioid-related-Overdose-Deaths-among-MA-Residents-May-2019.pdf [https://perma.cc/2BSH-YY8T].  As discussed supra, the toxicology results of Sinacori's blood revealed heroin, not fentanyl.

The creation of a per se rule -- that the transfer of heroin to a person addicted to heroin, without more, is sufficient to support a finding of the required element of wanton or reckless conduct -- is inconsistent, both jurisprudentially and empirically, with the requirement that conduct, to be found wanton or reckless, must create a high degree of likelihood that substantial harm will result to another.  For all practical purposes, an indictment for involuntary manslaughter premised on the transfer of heroin revises the definition of wanton or reckless.  We decline to carve out a heroin exception to our law of involuntary manslaughter.  Nor need we do so where the distribution of heroin alone carries severe penalties and where, when specific evidence of circumstances increasing the risk of harm is proven, a distribution of heroin resulting in death may be punished as involuntary manslaughter.

d.  <u>Approach of other State courts</u>.  Although the definition of "wanton or reckless" as applied to involuntary manslaughter is not uniform among the fifty States, we think it worthy of note that numerous State appellate courts that have recently considered the issue have declined to adopt a per se rule that the distribution of heroin alone, without more, suffices to support a verdict of involuntary manslaughter.

The Supreme Court of Kentucky in Lofthouse, 13 S.W.3d at 241, in vacating a conviction of reckless homicide, rejected both the defendant's "proposition that furnishing controlled substances to one who subsequently dies from their ingestion can never support a conviction of criminal homicide and the Commonwealth's proposition that such will always support a conviction" (emphasis in original). Id. The court highlighted the importance of additional evidence:

> "[G]uilt of criminal homicide, like any other offense, depends upon proof. . . . For example, in the Tennessee case of State v. Randolph, [676 S.W.2d 943 (Tenn. 1984)], there was evidence that another of one defendant's customers had died the same way two weeks earlier, and that another defendant knew that the heroin sold to the victim was 'uncut' and dangerous because it had not been diluted. And in the New York case of People v. Cruciani, [36 N.Y.2d 304 (1975)], there was evidence that the defendant injected the victim with heroin after she was already 'bombed out' on depressants and that the defendant was aware of the substantial possibility that the injection would cause the victim's death."

Lofthouse, supra.

The Missouri Court of Appeals in Shell, 501 S.W.3d at 32, vacated a defendant's conviction of involuntary manslaughter where the "[d]efendant's [only] affirmative act was delivering heroin to" the victim. The court concluded that, despite State testimony by a forensic pathologist of the inherent risk of heroin overdose, the State did not prove beyond a reasonable doubt that the defendant acted recklessly, because it did not prove beyond a reasonable doubt that the victim's death was

probable under the circumstances. Id. at 33. It further noted that "[w]hile we recognize the concern of the heroin epidemic and the rise in deaths as a result of heroin use . . . [t]o rule as the State suggests and hold that [the d]efendant acted recklessly simply by providing [the victim] with heroin would create a per se involuntary manslaughter rule, which we are unwilling [to] impose upon criminal defendants absent clear legislative intent." Id.

The Court of Appeals of Iowa came to a similar conclusion, also vacating a conviction of involuntary manslaughter arising out of an overdose death. See Miller, 874 N.W.2d at 667. The court determined that, without circumstances increasing the risk of harm, there was insufficient evidence to establish that the defendant acted recklessly. Id. at 666 (there must be "evidence establishing an increased risk of death and the defendant's awareness of an elevated risk of overdose and death beyond mere delivery of the controlled substance"). As to the State's suggestion "that the delivery of heroin, without more, is always substantial evidence of recklessness," the court rejected "this per se or categorical approach," id. at 664, for three reasons:

> "First, such an approach is inconsistent with our case law regarding criminal recklessness. The mere delivery of heroin, without more, does not necessarily establish a sufficiently material increase in the probability of the proscribed harm. More important, the per se approach is inconsistent with the culpability aspect of recklessness, in which the jury must determine whether the defendant had

or should have had a 'subjective awareness of the risk' such that his disregard of the increased risk warrants criminal sanction. . . . Second, the per se approach is inconsistent with our general approach to criminal proceedings, which requires the State to prove beyond a reasonable doubt each and every element of the offense. . . . Third, adopting a rule of strict liability for death resulting from delivery of a controlled substance is a policy decision best addressed by the legislature rather than the judiciary."[9]

---

[9] As to this third point, at least eighteen States have enacted laws providing for strict liability homicide where a person transfers heroin to another who later overdoses and dies. See Alaska Stat. § 11.41.120(a)(3) (manslaughter); Colo. Rev. Stat. § 18-3-102(1)(e) (murder in first degree only as to distribution to minor on school grounds); Fla. Stat. § 782.04(1)(a)(3) (murder in first degree); 720 Ill. Comp. Stat. 5/9-3.3 ("drug-induced homicide" with minimum sentence of fifteen years); La. Rev. Stat. Ann. § 14:30.1(A)(3) (second degree murder); Mich. Comp. Laws § 750.317a (drug-induced homicide with sentence up to life); Minn. Stat. § 609.195(b) (murder in third degree); N.H. Rev. Stat. § 318-B:26(IX) (strict liability homicide with sentence up to life); N.J. Stat. Ann. § 2C:35-9 (strict liability homicide); N.C. Gen. Stat. § 14-17(b)(2) (second degree murder); Okla. Stat. tit. 21, § 701.7(B) (murder in first degree); 18 Pa. Cons. Stat. § 2506 ("drug dealing resulting in death" as homicide offense); R.I. Gen. Laws § 11-23-6 (drug-induced homicide only as to distribution to minor, carrying life sentence); Tenn. Code Ann. § 39-13-210(a)(2) (second degree murder); Wash. Rev. Code § 69.50.415 ("controlled substances homicide"); W. Va. Code § 61-2-1 (murder in first degree); Wis. Stat. § 940.02(2)(a), (b) (first degree reckless homicide); Wyo. Stat. Ann. § 6-2-108 (drug induced homicide).

Three other States ratchet up the permissible sentencing range for drug distribution where it results in death from an overdose. See Del. Code Ann. tit 16, § 4752B; Kan. Stat. Ann. § 21-5430; Vt. Stat. Ann. tit. 18, § 4250.

The Massachusetts Legislature has considered strict liability homicide legislation but did not enact it. See 2017 Senate Doc. No. 2158 at 7 ("Any person who . . . distributes[ ] or dispenses heroin . . . is strictly liable for a death which results from the injection, inhalation or ingestion of that substance, and shall be punished by imprisonment for life or for

Id. at 664-665.

Most recently, in State v. Thomas, 464 Md. 133, 140 (2019), the Court of Appeals of Maryland -- Maryland's highest court -- affirmed the defendant's conviction of involuntary manslaughter on the theory of gross negligence but declared that "a per se rule providing that all heroin distribution resulting in death constitutes gross negligence involuntary manslaughter is unwise and not in keeping with our precedent." Id. at 167. "Instead," the court stated, "we must consider the inherent dangerousness of distributing heroin with the attendant environmental risk factors presented by each case." Id.[10] That conclusion is consistent with our holding here.

---

any term of years as the court may order, and by a fine or not more than $25,000; provided, however, that the sentence of imprisonment . . . shall not be reduced to less than 5 years, nor suspended, nor shall any such person be eligible for probation, parole or furlough or receive a deduction from his or her sentence for good conduct until such person shall have served 5 years of such sentence").

A bill with the same text as the 2017 bill was reintroduced in 2019. See 2019 House Doc. No. 1411.

[10] We recognize that the court in State v. Thomas, 464 Md. 133, 145, 147-150, 180 (2019), found the evidence sufficient to establish gross negligence involuntary manslaughter based on facts comparable to those in the instant case: the victim was known to be drug addicted, the defendant had sold four bags of heroin to the nineteen year old victim on the night he died from an overdose, the defendant himself had regularly used four bags of the same heroin product and had not overdosed, there was no evidence of the unusual potency of the heroin, and, when confronted with the victim's death, the defendant told the

Today we simply reaffirm that "guilt of criminal homicide, like any other offense, depends upon proof." Lofthouse, 13 S.W.3d at 241. Where there is specific evidence that the defendant knew or should have known that his or her conduct created "a high degree of likelihood that substantial harm will result," Welansky, 316 Mass. at 399, the Commonwealth may indeed convict the person who sold or gave the heroin to the decedent of involuntary manslaughter. But here, the Commonwealth in its

_____

police lieutenant, "He couldn't have overdosed off what I sold him; I only sold him four bags."

But we also recognize that the legal standard in Maryland for gross negligence involuntary manslaughter differs from our legal standard for involuntary manslaughter, even though Maryland law equates "'gross negligence' with a 'wanton or reckless disregard for human life'" (citation omitted). Id. at 153. Although the common law of Massachusetts defines wanton or reckless conduct as conduct that creates a high degree of likelihood that substantial harm will result to another, under the common law of Maryland, "'gross negligence' mens rea is established by asking whether the accused's conduct, under the circumstances, amounted to a disregard of the consequences which might ensue and indifference to the rights of others" (quotations omitted). Id., quoting State v. Albrecht, 336 Md. 475, 500 (1994). The Thomas court added that, for criminal gross negligence, "the inherent dangerousness of the act engaged in, as judged by a reasonable person, . . . is combined with environmental risk factors which, together, make the particular activity more or less 'likely at any moment to bring harm to another'" (emphasis added). Thomas, supra at 159, quoting Johnson v. State, 213 Md. 527, 533 (1957). Indeed, the court noted that the holdings of the Kentucky court in Lofthouse, 13 S.W.3d at 241, and the Iowa court in Miller, 874 N.W.2d at 663, were "inapt" because the standard for criminal gross negligence in those States "requires the State to demonstrate a higher 'probability of harm' than the one borne out by our cases." Thomas, supra at 166.

case-in-chief proved little more than that Sinacori overdosed and died after using heroin given to him by the defendant; it proved no additional facts that transformed the inherent possibility of an overdose arising from any use of heroin into a high degree of likelihood of an overdose.  As a result, the evidence was insufficient to support a finding beyond a reasonable doubt that the defendant knew, or that a reasonable person would have known, that there was a high degree of likelihood that Sinacori would overdose from the use of that heroin.  Consequently, the conviction cannot stand.  We remand the case to the Superior Court for entry of a required finding of not guilty on the involuntary manslaughter indictment.

2.  <u>Failure to give instruction on the lesser included offense of simple possession of heroin</u>.  As another consequence of his transfer of heroin to Sinacori, the defendant was convicted of distribution of heroin in violation of G. L. c. 94C, § 32.[11]  The second issue on appeal is whether the judge erred by declining to instruct the jury on the lesser included offense of simple possession of heroin.  The defendant argues that the jury should have been given the opportunity to convict

---

[11] The defendant was sentenced on the heroin distribution conviction to two years and six months in a house of correction, with one year to serve and the balance suspended and five years' probation.  He was sentenced to a concurrent probation term of five years on the involuntary manslaughter conviction.

him only of possession, not distribution, because he and Sinacori were engaged in a "joint venture" to possess heroin when the defendant purchased it in New York. The defendant twice requested this instruction -- before trial and after the close of all the evidence -- and objected to the judge's refusal to give it. Accordingly, we review the judge's decision for prejudicial error. Commonwealth v. Henderson, 434 Mass. 155, 158 (2001).

In contrast with our evaluation of the sufficiency of the evidence of involuntary manslaughter, where we considered only the evidence that was presented before the defendant moved for a required finding of not guilty after the Commonwealth rested its case-in-chief, here we review all the evidence presented at trial to determine whether it would permit the jury to find the defendant guilty only of simple possession. See id. "In determining whether any view of the evidence would support a conviction on a lesser included offense, 'all reasonable inferences must be resolved in favor of the defendant,' Commonwealth v. Vanderpool, 367 Mass. 743, 746 (1975)." Commonwealth v. Gilmore, 399 Mass. 741, 746 (1987), quoting Commonwealth v. Egerton, 396 Mass. 499, 503 (1986). If the evidence would so permit, "a judge must, upon request, instruct the jury on the possibility of conviction of the lesser crime"

(citation and emphasis omitted).  Commonwealth v. Roberts, 407
Mass. 731, 737 (1990).

a.  The defendant's testimony.  The defendant testified in
his own defense and admitted that he possessed heroin on the
evening in question and gave some of that heroin to Sinacori.
The defendant testified that he frequently drove from Amherst to
the Bronx -- up to four times per week -- to purchase heroin for
his own personal use.  After Sinacori asked the defendant to
purchase some heroin for him, the defendant on October 1, 2013,
collected one hundred dollars from Sinacori and drove to New
York to purchase heroin both for himself and for Sinacori.  Upon
his return, he and Sinacori each used some of their own heroin
in the defendant's apartment.  Sinacori sent him a text message
on October 3 to ask if he was "making another run," which the
defendant understood to mean that Sinacori wanted more heroin.
Sinacori provided the defendant with seventy dollars to purchase
seven bags of heroin, and promised to give the defendant another
thirty dollars later that evening in exchange for a total of ten
bags.  As he had done when he previously went to New York to buy
heroin for himself and Sinacori, the defendant put Sinacori's
money -- and then the heroin once it was purchased -- in a
different pocket to keep their respective shares separated.
Sinacori was ultimately only able to produce another twenty
dollars, so the defendant gave Sinacori nine bags and kept the

remaining one out of the ten-pack for himself, in addition to the other heroin that he had bought for himself.

Sinacori did not accompany the defendant to New York in either instance. There was no evidence that Sinacori himself had any interaction with the defendant's supplier in New York or had any role in negotiating prices. In contrast, the defendant frequently purchased his own heroin from the same supplier, sometimes negotiating for discounts. On September 30, for example, before the October 1 "run" to buy heroin for himself and Sinacori, the defendant sent Sinacori a text message indicating that he would try to get a "deal" on twenty bags.

b. Discussion. The statutory scheme governing distribution of controlled substances defines "[d]istribute" as "to deliver other than by administering or dispensing a controlled substance." G. L. c. 94C, § 1. "Deliver" is defined as "to transfer, whether by actual or constructive transfer, a controlled substance from one person to another, whether or not there is an agency relationship." Id. The defendant contends that, although he literally delivered heroin to Sinacori, he did not deliver the heroin within the meaning of G. L. c. 94C, § 1, because Sinacori jointly and constructively possessed his share of the heroin at the same time that the defendant purchased it in New York, and the defendant thus could not "deliver" or "distribute" heroin that Sinacori already possessed. See State

v. Morrison, 188 N.J. 2, 14 (2006) ("It hardly requires stating that the 'transfer' of a controlled dangerous substance cannot occur . . . if the intended recipient already [legally] possesses that substance").  In view of the relevant case law and the factual circumstances in this case, however, we are not persuaded that a reasonable jury could have found that Sinacori jointly possessed his share of the heroin when the defendant purchased it for him in New York.

In Commonwealth v. Johnson, 413 Mass. 598, 605 (1992), we held that "to purchase [narcotics], even with friends' money, intending to transfer it to them, constitutes distribution," in violation of G. L. c. 94C, § 32.  While we recognized an exception "[w]here two or more persons simultaneously and jointly acquire possession of a drug for their own use intending only to share it together," which would constitute joint possession, this is "limited to the situation when the persons . . . are there at the acquisition together and simultaneously acquire."  Id. at 604.  Of course, "[n]o cases require literal simultaneous possession" or acquisition, Weldon v. United States, 840 F.3d 865, 867 (7th Cir. 2016), but Johnson suggests that all parties engaged in joint possession must at least be physically present at the time the drugs are acquired.  We further held in Commonwealth v. Fluellen, 456 Mass. 517, 525 (2010), that a joint possession theory is "inapplicable to

circumstances where a defendant facilitates a transfer of drugs from a seller to a buyer."  See Commonwealth v. Jackson, 464 Mass. 758, 763 (2013) (facilitating transfer of drugs "can constitute the crime of distribution even if the defendant intends to share some of the drug with the buyer"); Commonwealth v. Rodriguez, 456 Mass. 578, 584 n.8 (2010) (distinguishing "defendant's transfer of cocaine he had just purchased, which would constitute distribution, [and] his division of the cocaine that [he and another] had simultaneously and jointly acquired, which would constitute joint possession").  In short, the crime of distribution occurs "whenever the defendant serves as 'a link in the chain' between supplier and consumer."  Jackson, supra at 764, quoting Fluellen, supra.

Here, the defendant argues that we should revisit our rule that drugs are jointly possessed only where both persons were present when the drugs were acquired.  First, he contends, in essence, that Johnson and its progeny are no longer good law in light of our holding in Commonwealth v. Zanetti, 454 Mass. 449, 462 (2009), where we held that a defendant need not be physically present at the crime scene to be found guilty as a joint venturer.  Second, he argues that, in spite of Johnson, physical presence at the time of acquisition is not required where "the absent [party] was then entitled to exercise joint physical possession" of the illicit drugs (emphasis in

original).  State v. Carithers, 490 N.W.2d 620, 622 (Minn. 1992).  We address these arguments in turn.

In Zanetti, 454 Mass. at 463, we amended the formulation for joint venture liability that was articulated in Commonwealth v. Bianco, 388 Mass. 358, 366, S.C., 390 Mass. 254 (1983), which provided that "[t]he test [for joint venture] is whether each defendant was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary."  Concluding that this framework was confusing and failed to respect "the spirit behind the common law as now reflected in the aiding and abetting statute, G. L. c. 274, § 2," we instead adopted the formulation of aiding and abetting in cases where there was evidence "that more than one person may have participated in the commission of the crime."  Zanetti, supra at 467.  In so doing, we clarified that an accomplice who knowingly participated in the offense with the intent required for that offense may be convicted of the offense as a joint venturer even if not physically present at the scene of the crime.  Id. at 462, 467.  See Commonwealth v. Brown, 477 Mass. 805, 813 (2017), cert. denied, 139 S. Ct. 54 (2018), quoting Commonwealth v. Silanskas, 433 Mass. 678, 690 n.13 (2001) ("A defendant may be convicted as a coventurer when he or she is not present at the scene of the crime 'so long as

the jury [find] [that the defendant] had actually associated [himself or herself] with the criminal venture and assisted in making it a success'").

The flaw in the defendant's argument is that, since the time we decided the Zanetti case, we have repeatedly reaffirmed the requirement that both persons be physically present at the time of acquisition in order to show joint possession of narcotics under G. L. c. 94C. See Jackson, 464 Mass. at 763; Fluellen, 456 Mass. at 524-525. And, as we made clear in Zanetti, our "shift from the language of joint venture to the language of aiding and abetting does not enlarge or diminish the scope of existing joint venture liability." Zanetti, 454 Mass. at 468. Nor does it change our definition of joint possession.

Second, the defendant suggests, essentially, that our holding in Johnson requiring physical presence at the time of acquisition should be reexamined in light of our legal principles of constructive possession. Certainly, the possession of heroin "need not be exclusive," but "may be joint and constructive." Commonwealth v. Beverly, 389 Mass. 866, 870 (1983). See Instruction 3.220 of the Criminal Model Jury Instructions for Use in the District Court (2009) (possession) ("A person can also 'possess' something even if he is not its sole owner or holder. For example, a person is considered to

'possess' something which he owns or holds jointly with another person, who is keeping it for both of them").

And, to be sure, various courts have concluded that "[a] buyer could have 'constructive possession' before actual delivery," United States v. Palacios-Quinonez, 431 F.3d 471, 475 (5th Cir. 2005), cert. denied, 547 U.S. 1035 (2006), such as where a defendant so directly orders the "disposition or movement of the drug as to warrant the inference he possesses it." Id., quoting Armstrong v. Superior Court, 217 Cal. App. 3d 535, 539 (1990). See United States v. Pelusio, 725 F.2d 161, 167 (2d Cir. 1983), quoting United States v. Craven, 478 F.2d 1329, 1333 (6th Cir. 1973), cert. denied, 414 U.S. 866 (1973) ("Constructive possession exists when a person . . . knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others"). Consequently, a defendant who directs a courier to pick up a substantial quantity of heroin on his or her behalf may be found to have possessed the drugs once the courier obtained the drugs, even where the defendant is not present at the pick-up, and therefore may be found guilty of possession with intent to distribute if the drugs are seized when they are still in the courier's possession. See, e.g., United States v. Manzella, 791 F.2d 1263, 1266 (7th Cir. 1986) ("doctrine of constructive possession . . . creates a legal fiction to take

care of such cases as that of a drug dealer who operates through hirelings who have physical possession of the drugs. It would be odd if a dealer could not be guilty of possession, merely because he had the resources to hire a flunky to have custody of the drugs"); United States v. Felts, 497 F.2d 80, 82 (5th Cir. 1974), cert. denied, 419 U.S. 1051 (1974) ("a party who instigated the sale, negotiated the price, and caused the drug to be produced for the customer had constructive possession of it," which is sufficient to support conviction of possession with intent to distribute).

But here, the issue is whether a reasonable jury could conclude that the delivery the defendant made to Sinacori was not a "distribution" of drugs, but was instead a joint possession of drugs for personal use. In Commonwealth v. Blevins, 56 Mass. App. Ct. 206, 209 (2002), the Appeals Court identified circumstances where a defendant charged with distribution was entitled to a requested instruction on simple possession:

> "The evidence -- that the defendant and his two companions were friends who on occasion shared drugs; that the three had pooled their money to purchase drugs they intended to share; that they each participated in the negotiation for the purchase of drugs; and that all were present when the drugs were paid for and received -- was, if believed, sufficient to support a finding that the drugs were simultaneously and jointly acquired and intended to be shared only by the three purchasers."

Similarly, the United States Court of Appeals for the Seventh Circuit in <u>Weldon</u>, 840 F.3d at 867, concluded that a defendant may be guilty only of drug possession rather than of drug distribution where three friends "agreed to get high together, they shared the expense, they all went together to the drug dealer, and they shared the drug they bought from him." The fact that the defendant was the one who got out of the vehicle, paid the pooled money to the drug dealer, and carried the drugs back to the vehicle for the three of them to share did not necessarily mean that he was guilty of drug distribution. <u>Id</u>. at 866.[12]

If we were faced with facts comparable to those in <u>Weldon</u>, where equal partners participated in a drug purchase but only one partner walked to the supplier's vehicle to receive the drugs, we might need to revisit the rule in <u>Johnson</u> that drugs can be jointly possessed for personal use only where all persons were present when the drugs were acquired.  But we need not

---

[12] The court reasoned:

"Suppose you have lunch with a friend, order two hamburgers, and when your hamburgers are ready you pick them up at the food counter and bring them back to the table and he eats one and you eat the other.  It would be very odd to describe what you had done as 'distributing' the food to him.  It is similarly odd to describe what [the defendant] did as distribution."

<u>Weldon</u> v. <u>United States</u>, 840 F.3d 865, 866 (7th Cir. 2016).

revisit that rule here, because we do not have facts comparable to those in Weldon. In this case, the defendant traveled several hours across State lines to purchase the heroin while Sinacori remained in Amherst. There was no evidence that Sinacori had any involvement in negotiating the transaction. In contrast, the defendant explained to Sinacori the prices that were available, and the defendant alone had a role in trying to bargain for discounts. Moreover, the record reveals no evidence that Sinacori knew who the defendant's supplier was, or that he even knew precisely where the defendant was going. And when Sinacori was unable to pay the defendant for all the heroin that he purchased, the defendant kept a bag for himself, exercising a certain level of control over the drugs that he obtained from his supplier.

Here, unlike in Weldon, the defendant giving the drugs to Sinacori -- rather than vice-versa -- was not the result of a mere fortuity or convenience. The defendant was the "middle man," the link in the chain between supplier and buyer, who facilitated the sale of drugs to the buyer -- Sinacori. The fact that the defendant made no profit from the transaction is not dispositive as to whether he distributed the drugs rather than jointly possessed them for personal use. See Johnson, 413 Mass. at 605. What is dispositive is that the defendant's active role in this transaction differed substantially from

Sinacori's passive role -- the defendant knew the supplier, negotiated prices, traveled alone to obtain the heroin, and determined whether he would share the heroin with Sinacori.  See People v. Edwards, 39 Cal.3d 107, 114 (1985) (distinguishing scenario with "equal partners" in consummation of drug purchase, which would be joint possession, from scenario where one person "instigated the purchase and was actively involved in arranging and consummating the deal, while [the other] was wholly passive and merely accepted the heroin," which would be distribution).  On the facts of this case, viewed in the light most favorable to the defendant, we conclude that no reasonable jury could have concluded that the defendant was guilty only of the simple possession of heroin.  The judge therefore did not err in denying the defendant's request for the lesser included instruction.

Conclusion.  The order denying the defendant's request to instruct the jury on the lesser included offense of simple possession of heroin is affirmed, as is the judgment of conviction of distribution of heroin.  As to the defendant's conviction of involuntary manslaughter, the judgment is vacated, the verdict is set aside, and the case is remanded to the Superior Court for entry of a required finding of not guilty.

So ordered.